# UNITED STATES DISTRICT COURT
### for the
### District of New Mexico

FILED
United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

| In the Matter of the Search of | |
|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) ) ) ) ) |
| Subject Premises A-1 thru A-13 which are further described in Attachments A-1 thru A-13 which are attached hereto and incorporated herein | |

Case No.  MR 24-1983 through MR 24-1995

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachments A-1thru A-13, which are attached hereto and incorporated herein.

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is attached hereto and incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a), 843(b) 846, 18 U.S.C. §§ 1956(a)(1), 1791, 666, 371, and 2 | Possession with Intent to Distribute Controlled Substances, Use of a Communication Facility in Furtherance of Drug Trafficking, Conspiracy to Distribute Controlled Substances, Money Laundering, Providing or Possessing Contraband in a Jail Facility, Theft or Bribery Concerning Programs Receiving Federal Funds, Conspiracy, and Aiding and Abetting. |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Jordan Spaeth, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ email and telephone _____ *(specify reliable electronic means)*.

Date: October 29, 2024

*Judge's signature*

City and state:  Albuquerque, New Mexico

Steven C. Yarbrough, United States Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

## INTRODUCTION

1.      I, Jordan Spaeth, Special Agent of the Federal Bureau of Investigation ("FBI"), being first duly sworn, make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the following premises (hereinafter referred to as the "Subject Premises") and persons (hereinafter referred to as the "Target Subjects"). The Target Subjects are known to access or reside at the real property, improvements and residences identified as the Subject Premises A-1 thru A-13.

| | SUBJECT PREMISES | TARGET SUBJECTS |
|---|---|---|
| A-1 | 417 Monte Alto Place NE, Albuquerque, New Mexico 87123 | NORA BACA |
| A-2 | 1812 Del Norte Drive SW, Albuquerque, New Mexico 87105 | ESTRELLA GONZALEZ |
| A-3 | 4903 Rincon Road NW, Albuquerque, New Mexico 87105 | ANGELO GARCIA |
| A-4 | 1333 Columbia Dr. SE, Apartment #95 Albuquerque, New Mexico 87106 | MONALISA VARGAS |
| A-5 | 9748 Summer Shower Place NW, Albuquerque, New Mexico 87120 | THERESA ATENCIO |
| A-6 | 2331 Menaul Boulevard NE, Albuquerque, New Mexico 87107 | JOHNNY VALITERRA, aka: "CHOPPER" |
| A-7 | 2331 Menaul Boulevard NE, Albuquerque, New Mexico 87107 | RICHARD PORRAS, aka: "DEUCE" |
| A-8 | 401 Dunes Court, Apartment D, Albuquerque, New Mexico 87123 | SONIA TRINIDAD |
| A-9 | 3 Jose P Sanchez Road, Los Lunas, New Mexico 87031 | DESIREE BENAVIDEZ |
| A-10 | 200 E. Jefferson Avenue, Gallup, New Mexico 87301 | ANA ROMERO |
| A-11 | 18 Arroyoito Loop, Seboyeta, New Mexico 87014 | ADOLFO MONTANO |
| A-12 | 8 Red Mesa Housing, Crownpoint, New Mexico 87313 | KIMBERLY PERRY and KELLY PERRY |
| A-13 | 7 Hughes Blvd, Grants, New Mexico 87020 | MONIQUE GALLEGOS and DAVID HICKS |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

More detailed descriptions and photographs of the Subject Premises and Target Subjects are contained within Attachments A-1 thru A-13, which have been attached hereto and incorporated herein by this reference.

## PURPOSE OF THE AFFIDAVIT

2.    The FBI Albuquerque Division Violent Gang Task Force[1] ("VGTF"), United States Marshals Service ("USMS"), with information from CoreCivic Intelligence Unit[2] have been engaged in an investigation of several gang members and drug traffickers involved in drug distribution within the Cibola County Correctional Center ("CCCC") located in Milan, New Mexico. The investigation pertains to an intergang conspiracy between CCCC inmates, gang members who are not incarcerated, and their criminal associates, to distribute controlled substances within CCCC.

3.    This affidavit is submitted in support of <u>13</u> warrants to search the Subject Premises and Target Subjects, which are believed to contain evidence of conspiracies to commit drug distribution and the introduction of contraband into a federal jail facility. This affidavit in in support of search warrants seeking evidence of violations of the below violations, collectively referred to hereinafter as the "Target Offenses":

a)  21 U.S.C. § 841(a) Possession with Intent to Distribute Controlled Substances,

b)  21 U.S.C. § 843(b) Use of a Communication Facility in Furtherance of Drug Trafficking,

c)  21 U.S.C. § 846 Conspiracy to Distribute Controlled Substances,

d)  18 U.S.C. § 1956(a)(1) Money Laundering,

---

[1] The VGTF is an FBI led task force comprising of agents and officers from the New Mexico State Police, Rio Rancho Police Department, Bernalillo County Sheriff's Office, and the Albuquerque Police Department.

[2] CoreCivic is a private company that provides corrections, detention, and reentry services to local, state, and federal government agencies. CoreCivic maintains an Intelligence Unit that focuses on the safety and security of their facilities, which includes monitoring gangs, drug activities, and potentially compromised staff members.

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

e)  18 U.S.C. § 1791 Providing or Possessing Contraband in a Jail Facility,

f)  18 U.S.C. § 666 Theft or Bribery Concerning Programs Receiving Federal Funds,

g)  18 U.S.C. § 371 Conspiracy, and

h)  18 U.S.C. § 2 Aiding and Abetting.

4.      I am submitting this affidavit based upon my experience and familiarity with the instant investigation. This affidavit does not set forth all of my knowledge or summarize all of the investigative efforts in the overall investigation; rather, this affidavit sets forth facts that support probable cause to search the requested locations and persons, as well as relevant background information. During my investigation, I have developed information I believe to be reliable from the following sources:

a)  Information provided by the FBI, USMS, United States Bureau of Prisons ("BOP"), United States Probation Office ("USPO"), New Mexico Corrections Department ("NMCD"), Bernalillo County Metropolitan Detention Center ("MDC") Security Threat Investigations Unit ("STIU"), CoreCivic Intelligence Unit, and other law enforcement or corrections officials, including oral and written reports;

b)  Results of physical and electronic surveillance;

c)  Information from dozens of Confidential Human Sources ("CHS" for both plural and singular);

d)  Information derived from consensually recorded conversations;

e)  Information provided by cooperating defendants (referred to herein as "CHS") and/or the defense attorneys representing those persons on their behalf;

f)  Information derived from lawfully intercepted communications, to include telephone, text, email, and video; and

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

g) Records from the FBI National Crime Information Center ("NCIC"), United States District Courts, New Mexico Courts, and New Mexico Motor Vehicle Division ("MVD").

5.      Where I refer to conversations herein, they are related in substance and, in-part, based on conversations between fellow agents, task force officers, detectives, intelligence analysts and officers, institutional gang investigators, or CHS that assisted law enforcement. Any observations referenced herein that I did not personally witness were relayed to me in oral and/or written reports by agents of the FBI or other agencies. All figures, times, and calculations set forth herein are approximate. Unless otherwise specified, weights of controlled substances are approximate.

## AFFIANT'S RELEVANT TRAINING AND EXPERIENCE

6.      I am a Special Agent with the FBI and am a law enforcement officer of the United States, within the meaning of Rule 41 of the Federal Rule of Criminal Procedure. I have been a sworn law enforcement officer for over 15 years. I have been an FBI Special Agent since 2018, and am currently assigned to the FBI's field office in Albuquerque, New Mexico, and to the VGTF in particular. As a member of the VGTF, my primary responsibility is to investigate criminal enterprises involving violent gang members and their associates who participate in murders, violations of the Controlled Substances Act, firearms violations, racketeering, and other violations of federal law.

7.      Before being assigned to the VGTF, I was assigned to the Violent Crime Task Force ("VCTF") and also investigated felony crimes in Indian Country. During my time on the VCTF, I investigated violent repeat offenders, the "worst of the worst" in the Albuquerque area, who participated in crimes such as commercial store robberies, carjackings, bank robberies, interstate threats, violations of federal firearm laws and the Controlled Substances Act. I also investigated

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

violent felonies which were committed on the various Indian Reservations and Pueblos surrounding Albuquerque, which included crimes such as murder, aggravated assault with a deadly weapon, rape, and use of a firearm while in the commission of a violent crime.

8.      My investigative training and experience include, but is not limited to, reviewing and analyzing phone records, interviewing subjects, targets, and witnesses, writing affidavits for, and executing search and arrest warrants, collecting evidence, conducting surveillance, and analyzing public and financial records. I have conducted hundreds of hours of surveillance on subjects, gang members, and associates suspected of, charged with, and/or convicted of violations of federal law, to include violations of the Target Offenses. Over the course of my career, I have arrested hundreds of persons for offenses including, but not limited to, murder, armed robbery, firearm violations, bank robbery, illegal narcotics possession and distribution, racketeering, and aggravated assault. I have also been responsible for serving subpoenas and supervising cooperating sources and undercover agents.

9.      I am the government's lead case agent in the investigation of the Brew Town Locos ("BTL") Gang. Over the course of that investigation, more than 35 BTL Gang members and associates have been charged federally. I have interviewed several dozen BTL Gang members and associates, including leaders within the organization. I have also participated in the execution of dozens of search warrants on members, associates, sources of supply, residences, and property for evidence of racketeering activity, VICAR murder, violations of the Controlled Substances Act, and federal firearms violations. I have seized more than 150 firearms, including machine guns, distribution quantities of fentanyl, methamphetamine, heroin, and cocaine, and more than $500,000 in property and cash. Also, I have worked with BCSO and APD on multiple murder investigations regarding BTL members and associates, solving three murders. I have briefed the

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

Attorney General and the FBI Director on the BTL case.

## BACKGROUND ALLEGATIONS REGARDING
## GANG/DRUG CRIMINAL ENTERPRISES

10.     Based upon my training, experience, and participation in the investigations of prison and street gangs, Drug Trafficking Organizations ("DTOs"), and other criminal enterprises, I am aware of the following information:

a)  The Syndicato de Nuevo Mexico (also known as the "SNM" or "New Mexico Syndicate") is New Mexico's largest prison gang and has boasted as many as 500 members in the past. As a result of FBI VGTF Operations since 2015, the SNM have been largely dismantled and dispersed among dozens of federal prisons across the country.

b)  The Sureños (Spanish: Southerners) or Sur 13 are groups of affiliated Hispanic gangs that pay tribute to the Mexican Mafia (Eme) prison gang[3] while in state and federal correctional facilities. The Sureños originated in southern California, and that area remains its stronghold, although they maintain a large presence in Arizona, New Mexico, and Nevada.

c)  The Paisas gang, short for paisanos (Spanish: fellow countrymen), are comprised of men from Mexico. Mexican cartel members and associates incarcerated in U.S. prisons typically fall under the Paisas gang.

d)  The Aryan Brotherhood ("AB") is made of four factions: the California AB within the California penal system, the Federal AB within the Federal Bureau of Prisons, the AB of Texas ("ABT") within the Texas penal system, and "all others" which are AB members from states other than California or Texas. The AB have historically been aligned with the

_____

[3] The Mexican Mafia, also known as La Eme (Spanish: "M") or The Black Hand, is a highly organized Mexican American prison gang in the United States. California and BOP officials report that the Mexican Mafia is the most powerful gang within the California and U.S. prison systems. Nearly 2,400 California Sureños in the BOP take orders from the Mexican Mafia. Source: FBI National Gang Intelligence Center and U.S. Bureau of Prisons.

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

Mexican Mafia (Eme) prison gang.

e) Inmates group together by race inside prison or jail, and the groups are called "cars." The leader of the car "holds" the "keys" to the car. They will sometimes be referred to as the "keyholder."

f) The Burqueños, described by the NMCD as a security threat group, is comprised of street gang members from Albuquerque who band together for protection in prison and jail.

g) The Nuevo car[4] (formerly the "505 car") is comprised of mostly-Hispanic inmates in the federal system who are from New Mexico, and not members of the SNM.

h) The Westside Locos ("WSL") are a street gang in Albuquerque. Most WSL members identify as members of the Burqueños in New Mexico jails and prisons. When in the federal prison system, most WSL members fall under the Nuevo car.

i) Gang members in New Mexico frequently work together to distribute drugs. In recent years, I have observed traditional gang rivalries set aside and associations be formed to distribute fentanyl and methamphetamine and make money. This newer phenomenon is particularly true in prison/jail settings where drugs are harder to acquire and significantly more expensive.

j) Individuals engaged in the type of criminal conduct constituting the Target Offenses (possession with intent to distribute controlled substances, use of a communication facility in furtherance of drug trafficking, conspiracy to distribute controlled substances, money laundering, providing or possessing contraband in a jail facility, theft or bribery concerning programs receiving federal funds, conspiracy; and aiding and abetting) maintain

---

[4] Much of the politics in the federal system and at CCCC are handled via meetings between the "cars" (racial and/or geographical groups).

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

documents, letters and records relating to their illegal activities for long periods of time. This documentary evidence is usually secreted in their place of residence, or the residences of family members, friends or associates, in their business locations, or in stash houses. This documentary evidence includes: telephone numbers, address books, travel receipts, notes referencing aliases or coded names, false identification, money order receipts, money orders, money remittance receipts, pre-paid money cards such as, MoneyPak, Wal-Mart, Green Dot, or other debit cards, CashApp electronic logs or records, bulk U.S currency, money collection logs, such as "tally" sheets, drug load sheets, shipping/mailing receipts, detention facility inmate number lists or addresses for inmates or detention facilities.

k)  Individuals engaged in the type of criminal conduct constituting the Target Offenses tend to maintain regular contact with one another. This contact does not terminate once an individual is incarcerated. Members of gang/criminal enterprises engage in in-person visits and routinely send and receive letters from other members and associates of the organization in which they discuss ongoing criminal activities and request various forms of assistance, to include sending drugs into the institution, financial help, and witness intimidation or elimination. Incarcerated members of gang/criminal enterprises also communicate via telephone calls, some of which are generated via third parties, video visits, and through institutional email and/or text messaging services.

l)  I am aware members of prison and street gangs aggressively pursue informants, suspected informants, and persons who are considered to have betrayed the gang(s). I am aware gang members relay such information to one another through covert communications, messages, emails, telephone calls, personal visits, letters, and mail sometimes disguised as "legal mail."

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

m) Many times, members of gangs, DTOs and associates send controlled substances to inmates disguised as legal mail. The instruments used to create fictitious and fraudulent legal mail include letters, writings, envelopes, stamps, labels, printing devices, or markings used to create such packages.

n) I know that members and associates of gang/criminal enterprises and DTOs have access to numerous cellular phones, often at the same time, to avoid law enforcement monitoring. I have observed gang members, who are involved in drug trafficking, routinely use pre-paid phones requiring no subscriber information, or fictitious subscriber names, to advance their unlawful activities. These cellular telephones often contain names and phone numbers of other co-conspirators, text messages utilized to further their illicit activities, photographs and videos of gang members, controlled substances, drug proceeds, or firearms. I am aware incarcerated members of gang/criminal enterprises utilize a non-gang member's personal identification number when making prison/jail telephone calls to mask their conversations and decrease the likelihood intelligence officers will monitor the call.

o) In addition, I am also familiar with the use of text messaging, instant messaging, and messaging applications, used by gang/criminal enterprises and DTOs to advance their unlawful activities. Members of gang/criminal enterprises and DTOs often use the same strategy to mask their ownership of vehicles, real property, and utility services, in an effort to avoid detection by law enforcement. I am aware CCCC, MDC, NMCD, and BOP inmates can utilize email services while incarcerated and believe those services are widely used by the inmates.

p) Individuals involved in the distribution of controlled substances often conceal evidence of their drug trafficking activities in their residences and businesses, or the residences of

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

friends or relatives, and in surrounding areas to which they have ready access, such as garages, carports, and outbuildings. They also conceal evidence in vehicles, including vehicles outside of their residences, so that they have ready access to it and so that they can hide it from law enforcement officers executing search warrants at their residences or businesses. I have also observed individuals involved in drug trafficking bury evidence underground in containers on their property.

q) Members of gang/criminal enterprises and DTOs often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records often remain for long periods of time, even years, to memorialize past transactions, especially when debts remain open. I have located notes documenting the status of accounts receivable and accounts payable, and the names and phone numbers of suppliers, customers, and co-conspirators, and other associates who have assisted drug traffickers in other ways, such as helping with the cleansing of otherwise "dirty" money. I am aware such proceeds may be made to appear "clean" through a variety of means, including investments into legitimate enterprises and structuring deposits of large amounts of U.S. Currency into financial institutions in such a way so as to avoid the detection by law enforcement, as well as reporting requirements of banking institutions. These records can be electronic or maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay-owe sheets, drug ledgers, IOUs, miscellaneous notes, money orders, customer lists, and phone address books. I have personally been involved in search warrants which resulted in the discovery of such records that were more than a year old.

r) Individuals involved in gang/criminal enterprises and DTOs possess items of

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

identification, including but not limited to, driver's licenses, rent receipts, bills, and address books. These items may be relevant to the identity of those involved in the criminal enterprise, the possessor of the items seized, and occupants of the premises searched.

s) I am aware that members and associates of the AB, Burqueños, SNM, Sureños, Paisas, Nuevo, and WSL, use, possess, and conceal bladed and/or blunt weapons, such as knives, shanks, razor blades, metal pipes, metal fittings, edged weapons; and firearms; to include rifles, shotguns, and handguns. These weapons are used and possessed by members of the gang to commit murders, attempted murders, assaults, robberies, to protect illicit drug supplies and proceeds, to avoid arrest or escape from custody, to intimidate rivals, victims, witnesses, and persons who have betrayed the gang(s), to impose discipline within the gang, and for other violent crimes. I know that firearms are instrumentalities of the crime of drug trafficking and that firearms are critical "tools of the trade" for the gang(s). Gang members and associates are expected to possess and maintain weapons and firearms.

t) I am aware members of DTOs often possess firearms to protect their drug supply and proceeds. Similarly, members and associates of DTOs utilize firearms to collect drug debts and discipline persons for non-payment. Some DTO members and associates use firearms to rob other DTO members of drugs and currency.

u) I am aware that a corrections officer ("CO") who engages in corrupt activities with gang members and drug dealers does so in veiled secrecy. Corrupt COs often employee measures to conceal their relationships with offenders from fellow staff members, internal affairs investigators, and law enforcement. I am also aware corrupt COs communicate with incarcerated gang members and drug dealers via third parties who relay messages, make payments, and provide contraband to the COs for subsequent importation and delivery of

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

that contraband into jails or prisons.

11.     The items described above are often stored by members of gang/criminal enterprises and DTOs on their person, in their businesses, residences and surrounding garages, outbuildings, and yards, the residences of friends or relatives, and vehicles.

## THE CIBOLA COUNTY CORRECTIONS CENTER

12.     The CCCC is located at 2000 Cibola Loop in Milan, New Mexico. The CCCC is one of three detention centers in New Mexico managed by CoreCivic.[5] CCCC has nine housing units composed of 34 pods. Each pod holds four to sixteen inmates. CCCC houses inmates for Cibola County, Immigration and Customs Enforcement ("ICE"), and the USMS. The following chart represents which agencies utilize the pods and the number of inmates within the CCCC (as of September 5, 2024):

| Agency | Number of Pods at CCCC | Inmate Count |
|---|---|---|
| USMS male inmates | 18 | 444 USMS |
| USMS female inmates | 3 | 17 BOP |
| Cibola County male inmates | 2 | 71 County |
| Cibola County female inmates | 1 | |
| ICE male inmates | 8 | 220 ICE |

Total inmates: 752

13.     CoreCivic struggles to keep CCCC operating in a safe and efficient manner, confronting many of the same issues that face other correctional facilities nationwide. Inmate-on-inmate and inmate-on-staff violence occurs periodically at CCCC, and COs seize clandestine weapons on a regular basis. In recent years, investigators have noticed a startling anomaly at CCCC: the sheer volume of controlled substances being trafficked within the facility. For example, during recent searches, CoreCivic officers located one pound of methamphetamine in one pod, more than 1,000

---

[5] CoreCivic manages the Torrance County Detention Facility in Estancia, NM, and the Northwest New Mexico Correctional Center in Grants, NM. CoreCivic manages nearly one hundred detention facilities across the United States.

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

fentanyl pills in another pod, one half pound of methamphetamine in another, and several ounces of heroin. The quantities of drugs seized are exceptionally large, given that they are located within a secure federal facility.

14.    The most common controlled substances trafficked within CCCC are methamphetamine, which is sold in an amount consistent with that would fit inside a toothpaste or Chapstick cap,[6] and Suboxone.[7] Fentanyl pills are also commonly distributed within CCCC.

15.    Controlled substances sell for exorbitant prices within prisons and jails, to include CCCC. Drugs are the number one contraband in prison/jail. Although the drug dealing takes place inside the facility, most of the money is exchanged on the outside. Profits go to dealers' spouses, families, associates, or simply accumulate until the dealer is released from custody. Everyone in the distribution network gets compensated, whether with money, drugs, commissary, stamps, or just prestige. The high prices are reflective of the substances being illegal, difficult to introduce into secure facilities, and the high demand for drugs. Isolation, boredom, stress, and the simple fact that a portion of the jail/prison population is comprised mostly of addicts all contribute to the popularity of drugs on the inside.

16.    As I mentioned, during recent searches, officers confiscated a pound of methamphetamine. One pound contains 454 grams. A toothpaste cap, or cap, of methamphetamine consists of one quarter of a gram (0.25 grams) and sells for approximately $150. Thus, a pound of methamphetamine can yield $272,400 in CCCC. To further illustrate the inflation, a pound of

---

[6] A toothpaste or Chapstick cap, which holds ¼ gram, is the instrument utilized to measure the typical quantity of methamphetamine sold within CCCC. The current price for a toothpaste cap full of methamphetamine is $150.

[7] Suboxone is the brand name for a medication that combines buprenorphine with naloxone. Suboxone is used to treat opioid addiction. Suboxone was designed to reduce the withdrawal symptoms associated with opioid addiction. Suboxone contains Buprenorphine and Naloxone. Suboxone can produce a euphoric sensation as it impacts the same opioid receptors in the brain and creates a flood of dopamine in the brain. A Suboxone high would be far less intense than the effects of fentanyl, heroin, or other opioids.

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

methamphetamine on the street in Albuquerque can sell for as low as $1,000. The bulk purchase of multiple pounds would be less per pound.

17.     Inside CCCC, contraband cellular telephones sell for as much as $2,000. Cell phones are an integral part of the illicit drug trade within CCCC, as all normal inmate telephone calls out of the facility are recorded by CoreCivic and subject to monitoring. Contraband cellular phones not only allow the user to conduct drug trafficking activities unmonitored, but also enable users to send and receive money via cellular applications (apps) such as CashApp. CashApp is the most common financial application utilized by CCCC inmates. Contraband cellular telephones have also been utilized by gang members, such as the SNM, Sureños, and AB, to instruct fellow gang members on the street to coordinate and conduct assaults and murders.

18.     In the chart below, I have detailed some of the statistics surrounding assaults, overdoses, drug seizures and weapon seizures at CCCC in recent years.

| Metric | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|
| Number of drug overdoses (non-fatal) | No data | No data | 1 | 7 |
| Number of assaults resulting in hospital admission (all inmate on inmate) | 1 | 4 | 3 | 2 |
| Number of assaults resulting in medical treatment | 16 | 10 | 11 | 7 |
|    Inmate on inmate | 13 | 7 | 9 | 6 |
|    Inmate on employee | 3 | 3 | 2 | 1 |
| Number of assaults not resulting in hospital admission or medical treatment | 52 | 36 | 35 | 33 |
|    Inmate on inmate | 32 | 25 | 18 | 9 |
|    Inmate on employee | 20 | 11 | 17 | 24 |
| Number of drug seizures | 85 | 81 | 41 | 43 |
| Number of weapons seized | 123 | 149 | 123 | 90 |

19.     One of the unique challenges to reducing the flow of illicit contraband into CCCC is the facility's physical location. The jail is bordered on the south by open land with a large ravine. The ravine has been utilized by smugglers to throw or slingshot contraband packages onto the jail's

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

recreational yard. The contraband packages can be recovered by inmates when they access the yard for recreational time. CCCC is bordered to the north by a parking lot utilized by semi-truck drivers and travelers accessing the adjacent Petro fuel and truck stop, as well as surrounding businesses that service semi-trucks. A person desiring to introduce contraband into the facility can stand approximately 15 feet from the CCCC perimeter fence and throw or slingshot a contraband package into the recreational yard. I have included an aerial overview of CCCC and two photos depicting the vulnerable parking lot area just north of the jail.



**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**



View from the roof of the CCCC to the adjacent public parking lot.



CCCC fence line to the north of the facility, located next to a public parking lot.

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

### GANG POLITICS AND INFLUENCE AT CCCC

20.     CCCC is primarily a federal holding facility and many of the inmates at CCCC have served time in federal prison (i.e. within the Bureau of Prisons). As such, these inmates are familiar with the federal system (often referred to as "the feds") and spread the politics and rules that apply in the feds. After all, the majority of CCCC inmates are headed to the feds or just got back from there.

21.     Federal prisons are largely divided and separated by racial gangs, which have their own leadership hierarchy, dining tables, recreational space, underground markets, and other amenities. Federal prison gangs operate on a model of collective, identity-based security. If a white inmate attacks a black inmate, or vice versa, their racial brothers must fight to protect the group's interests. The prisoners maintain separate facilities, separate sleeping quarters, and separate trade networks. They communicate with the other races through representatives (known as "reps") who deliver messages on behalf of gang leaders. Much of the politics in the federal system and at CCCC are handled via meetings between the "cars" (racial and/or geographical groups). Prison rules serve to keep the peace among the inmates and to avoid race riots. Such prison-wide disturbances result in lockdowns and serve to stymie drug sales. Everyone in the feds must abide by the rules or face being beat down by their car to avoid major fights or riots between the racial groups.

22.     The white inmates in federal facilities have gangs like the California AB, Nazi Low Riders, Public Enemy Number One, AB of Texas, and other groups. The various white gangs may have different policies; however, they are collectively the "white car." Whichever white gang has the biggest presence on the yard will likely represent entire white car.

23.     The same structure applies to the black inmates, although geography plays a big part due to the number of rival black gangs (Crips, Bloods, Black Guerilla Family, Vice Lords, and the Gangster Disciples just to name a few).

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

24.     The Hispanic gang population has multiple rivalries and there is a long-standing split between certain gangs. West Coast gangs like La Eme, Sureños, and MS-13 may ride together, but maintain a bloody rivalry with other West Coast Hispanic gangs like Nuestra Familia and the Norteños. Most California gangs do not ride with the Texas Hispanic gangs such as the Barrio Azteca, Tango Blast, Hermanos de Pistoleros Latinos, and Texas Syndicate.[8]

25.     If an inmate in one car has an issue with an inmate from another car, then influential representatives (also known as "shot callers") from the related cars will meet and discuss the issue. If an inmate within the car is determined to be at fault, his own car will discipline him – which normally consists of a significant beat down.

26.     As I mentioned, the politics in at CCCC mirror those in federal prisons. The rules are often relaxed, however, when less influential inmates are housed or there is an influx of drugs. When influential gang members are at CCCC, the younger and lesser experienced gang members adhere to the federal structure as maintained by the older gang members. Most members of the various New Mexico street gangs are unfamiliar with the rules and politics of the federal system. Because New Mexico is such a small state, with a relatively small presence in the BOP, all Hispanic New Mexicans ride in the same car in the feds, which is referred to as "Nuevo."[9] The car used to be referred to as "505;" however that was thought to be disrespectful and not representative of inmates from southern and eastern New Mexico (where the prevailing phone number area code is 575 rather than 505).

---

[8] I have limited experience with East Coast Hispanic gangs, but know they maintain their own cars in federal system. Additionally, there are religious groups that ride together and have their own policies, such as the Muslims, which are fragmented among Sunni, Shiite, Nation of Islam, and others.

[9] Even with the large influx of SNM prison gang members into the federal system in recent years, New Mexico maintains a relatively small presence on federal prison yards. In some BOP facilities the SNM and Nuevo members did not associate and maintained their homegrown rivalry, while at other facilities they all blended into the Nuevo car. Nevertheless, all Hispanic inmates from New Mexico fall under the Eme and Sureños.

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

27.    When CCCC is flooded with illicit drugs, many of the rules are relaxed. A new rule seems to have arisen in CCCC, which is: "Whoever has the dope, has the power." I believe the same rule applies to the streets of Albuquerque. In recent years, I have observed the traditional gang rivalries, strict leadership structures, and geographical gang boundaries relaxed, and we now commonly see gang rivals working together to distribute methamphetamine and fentanyl. Gang allegiance is secondary to money and profit.

## OVERVIEW OF THE CCCC INESTIGATION

28.    In early September 2024, the VGTF was tasked with investigating criminal activity taking place at CCCC.[10] The FBI Special Agent in Charge ("SAC") of the Albuquerque Division related that federal judges had expressed concerns to the United States Attorney's Office ("USAO") about the unsafe conditions at CCCC. The USAO shared that information with the FBI. The investigation was further predicated on similar concerns from the USMS.

29.    VGTF agents reviewed all available information on the inmates, staff, and persons outside the jail involved in smuggling, distributing, and profiting from the illicit trafficking of contraband inside CCCC. VGTF agents reviewed intelligence information, reports, phone calls, letters, writings, and other pertinent information spanning the past three years. VGTF agents interviewed current and former CCCC inmates about the drug trafficking activities taking place at CCCC.

30.    Our investigative efforts yielded information on not only the most prolific and problematic drug dealers at CCCC, but we have also identified the most successful methods in which the drugs are smuggled into the facility.

       a)    <u>Staff Introduction</u>: corrupt staff members are paid to smuggle drugs or cell phones

---

[10] The VGTF's investigation built on pre-existing investigations being conducted by the FBI, USMS, and other agencies. This effort, however, represents a new concentration of resources and agents on solving the problems.

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

into the jail. Staff members have been paid as much as $5,000 each time they brought drugs in.

b) <u>Throw-Over</u>: contraband is thrown or launched over the perimeter fence at CCCC into the recreational yard and recovered by inmates.

c) <u>Body-Pack</u>: Persons being arrested and sent to CCCC secrete contraband inside their body cavities and remove it once they are placed into a pod (including those who violate the terms of their supervised release for the express purpose of body-packing contraband into the facility upon arrest).

d) <u>Legal Mail</u>: Inmates receive envelopes labelled "legal mail" that contain the return address of an attorney, official state agency, court, or other official entity, and those envelopes are provided to the inmate without CCCC search or intrusion.

31.    During the instant investigation, VGTF agents focused their efforts on the inmates involved in the most egregious and recent drug trafficking activities. Much of the focus of the investigation centered on the persons outside the jail facility involved in drug distribution and money laundering on behalf of the targeted CCCC inmates.

32.    This affidavit seeks to search 12 premises involved in a conspiracy to introduce contraband to CCCC and distribute controlled substances therein. During the investigation, agents developed probable cause indicating some of the Target Subjects were also involved in trafficking drugs on the street in Albuquerque. All of the Target Subjects are either affiliated with gangs or assist the gangs' ends when they introduce drugs, cell phones, and other contraband into CCCC.

33.    In the pages that follow, I have sought to identify each criminal conspiracy, explain the Target Subjects participation in the conspiracy, and articulate the probable cause to believe the evidence described in Attachment B will be found at the Subject Premises and on the Target

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

Subjects.

## CONTRABAND DEFINED AND ITS VALUE WITHIN THE CCCC

34.    The most common controlled substances trafficked within CCCC are methamphetamine, Suboxone, and fentanyl pills. Contraband cellular telephones are also in high demand among inmates. VGTF agents interviewed dozens of cooperating defendants at CCCC and noted the current prices of drugs and cell phones within the facility:

- Methamphetamine "caps," which equal one quarter gram (0.25 grams), sell for $150.

- One Suboxone strip sells for $100.

- One fentanyl pill sells for $50 and three pills sell for $100.

- A contraband cellular telephone sells for $2,000.

- CashApp is the financial trading platform in which drugs are bought and sold.

Common drug weights and terminology in jail/prison settings:

- Cap = 1/4 gram, 0.25 grams

- Teener = 1/16 of an ounce, 1.75 grams

- 8-ball = 1/8 of an ounce, 3.5 grams

- 1 ounce = 28 grams

- 1 pound = 454 grams, 16 ounces

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**



*Left*: Fentanyl pills, often referred to as "blues."

*Left*: On September 6, 2022, COs located 348 Suboxone strips inside the maximum-security cell of inmate Robert Padilla, aka: "Fathead." This was a record seizure for officers at the NMCD Penitentiary of New Mexico. Padilla had been transferred to the penitentiary from CCCC in the days prior.

US v. Robert Padilla, 22-CR-634

*Left*: Suboxone strips packaged for concealment and sale as single strips and in ten, and twenty-five packs.

US v. Robert Padilla, 22-CR-634

*Left:* A large quantity of methamphetamine "caps" found inside CCCC in May 2022.

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**





*Left*: The bag of meth caps in the lower photo weighed 58 grams, which equals about 232 caps. Each cap sells for $150 and contain one quarter gram of methamphetamine.

232 x $150 = $34,800

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**



*Left:* Prison weapons referred to as shanks or shivs (larger versions sometimes being referred to as "bonecrushers." Each year, CCCC officials seize more than one hundred such weapons.

Weapons such as these are tools of the trade for drug dealers and gang members in jail and prison.

### THE CONFIDENTIAL HUMAN SOURCES

35.     During the instant investigation, FBI agents utilized 43 CHS[11] to infiltrate the Target Subjects and their criminal associates. Agents encouraged many of the CHS to maintain contact with the Target Subjects who were engaged in ongoing criminal activity.

36.     Regarding the veracity of the CHS reporting herein, I am aware that prison and street gangs often assault or murder former members who tell their secrets, which means the gangs themselves appear to consider CHS' accounts to be reliable and accurate enough to silence them. Most of the CHS utilized in this investigation have extensive experience with the criminal justice system, incarceration, and their respective gangs. Dozens of CHS detailed their knowledge and involvement in the drug trade at CCCC. The information the various CHS provided on the drug trade and gang subculture is impressive. Many of the CHS are affiliated with the AB, SNM, Paisas, Sureños, or Nuevo gangs. Finally, agents have been able to corroborate much of the CHS reporting

---

[11] The FBI utilize the term CHS to describe an informant; however, other agencies may use Confidential Source (CS), Confidential Informant (CI), Confidential Witness (CW), or Source of Information (SOI). I believe the various terms are interchangeable, but for the purposes of this affidavit I have only used only the term CHS.

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

by comparing the accounts of different CHS with no relationship with one another, recorded telephone calls from within CCCC, and other means.

37.    Many of the CHS are cooperating defendants with pending felony criminal charges before the court. The CHS who have pending criminal matters voluntarily provided information to the government in the hopes of receiving a reduced sentence pursuant to Section 5K1.1 of the United States Sentencing Guidelines.[12] Much of the information from the cooperating defendants was self-inculpatory and corroborated by several other cooperating defendants. Cooperation with the government exposes the CHS to harm or death should their identities become known to other offenders.

38.    I have sought to provide the Court with some of the underlying circumstances and background information I relied upon in determining the information from the various CHS was reliable. In the paragraphs that follow, I have provided an overview of each CHS, to include:

    a) their basis of knowledge concerning the criminal conduct,

    b) motivation to assist the FBI,

    c) criminal history,

    d) any compensation received from the government, and

    e) a statement concerning their reliability.

39.    I have sought to provide sufficient information to the Court, while balancing the anonymity and safety of the various CHS. All the CHS described herein expressed fear of retaliation if their identities became known to the Target Subjects and their criminal associates.

40.    **CHS-1** is a gang member and drug dealer who has distributed drugs on the street and in

---

[12] If the prosecutor files a motion under U.S.S.G. § 5K1.1, whether to grant that motion and the magnitude of the reduction in offense level is up the presiding judge, and not the U.S. Attorney's Office or FBI.

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

jail/prison. CHS-1 has served time at CCCC and served as a "pod rep"[13] within the facility. CHS-1 testified for the government during a federal racketeering-murder trial and has provided information to the FBI that resulted in the issuance of more than a dozen federal search warrants. Information provided by CHS-1 resulted in the seizure of a considerable amount of controlled substances, numerous firearms, and the arrests of several subjects. CHS-1 has been incarcerated with several of the Target Subjects and knows other Target Subjects from the streets. CHS-1 is motivated to assist the FBI to help reduce violent crime and drugs in the community and by monetary compensation. CHS-1 has prior felony convictions for robbery, arson, possession of a controlled substance, receiving or transferring stolen property, unlawful taking of a motor vehicle, possession of a deadly weapon by a prisoner, and conspiracy. CHS-1 does have a pending charges and has received $600 in financial assistance from the FBI.[14] I consider the information CHS-1 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, recorded telephone calls, and physical surveillance. To my knowledge, CHS-1's information has not been found to be false or misleading.

41.    **CHS-2** is a gang member and drug dealer who has distributed drugs on the street and in jail/prison. CHS-2 has served time at CCCC and served as a pod rep within the facility. Information provided by CHS-2 led to the seizure of drugs and other contraband at CCCC. CHS-2 is motivated to assist the FBI in hopes of receiving a positive recommendation in a pending felony matter. CHS-2 has prior felony convictions for possession of a controlled substance and auto theft. CHS-2 has not received any financial assistance from the FBI. I consider the information CHS-2 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement

---

[13] Pod reps are influential inmates and leaders within the pod. Pod reps handle disputes within the pod and meet with other pod reps around the jail to discuss dispute resolution, inmate solidarity, and other political matters.

[14] Financial assistance may include general payments, moving expenses, or fuel for the CHS's vehicle during operational support to the FBI.

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

investigation, recorded telephone calls, and physical surveillance.

42.    **CHS-3** is a gang member and drug dealer who has distributed drugs on the street and in jail/prison. CHS-3 has served time at CCCC and served as a pod rep within the facility. Information provided by CHS-3 led to the seizure of drugs and other contraband at CCCC. CHS-3 has been motivated to assist the FBI in hopes of receiving a positive recommendation in a pending felony matter. CHS-3 has prior felony convictions for aggravated battery, larceny, armed robbery, and being a felon in possession of a firearm. CHS-3 has not received any financial assistance from the FBI. The information CHS-3 provided to the FBI could be viewed as a statement against interest, as CHS-3 admitted to participating in criminal activity.[15] I consider the information CHS-3 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, recorded telephone calls, and physical surveillance. To my knowledge, CHS-3's information has not been found to be false or misleading.

43.    **CHS-4** is a gang member and drug dealer who has distributed drugs on the street and in jail/prison. CHS-4 has served time at CCCC and is motivated to assist the FBI in hopes of receiving a positive recommendation in a pending felony matter. CHS-4 has prior felony convictions for aggravated assault, robbery, drug distribution, and firearms violations. CHS-4 has not received any financial assistance from the FBI. I consider the information CHS-4 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, recorded telephone calls, and physical surveillance. To my knowledge, CHS-4's information has not been found to be false or misleading.

44.    **CHS-5** is a drug dealer who has distributed drugs on the street and in jail/prison. CHS-5

---

[15] CHS-3 is protected against the statements being used against him directly, but only if they are true, according to the terms of the *Kastigar* debriefs. That is true of all CHS who provided information through the *Kastigar* debrief process.

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

has served time at CCCC and is motivated to assist the FBI in hopes of receiving a positive recommendation in a pending felony matter. CHS-5 has prior felony convictions for burglary, robbery, and drug distribution. CHS-5 has not received any financial assistance from the FBI. I consider the information CHS-5 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, recorded telephone calls, and physical surveillance. To my knowledge, CHS-5's information has not been found to be false or misleading.

45.    **CHS-6** is a gang member and drug dealer who has distributed drugs on the street and in jail/prison. CHS-6 has served time at CCCC and was motivated to assist the FBI in hopes of receiving a positive recommendation in a then-pending felony matter.[16] CHS-6 has prior felony convictions for drug distribution, drug transportation, assault with a deadly weapon, and resisting arrest with a prior felony conviction. CHS-6 has not received any financial assistance from the FBI. The information CHS-6 provided to the FBI could be viewed as a statement against interest, as CHS-6 admitted to participating in criminal activity. I consider the information CHS-6 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, recorded telephone calls, and physical surveillance. To my knowledge, CHS-6's information has not been found to be false or misleading.

46.    **CHS-7** is a gang member and drug dealer who has distributed drugs on the street and in jail/prison. CHS-7 has served time at CCCC and was motivated to assist the FBI in hopes of receiving a positive recommendation in a pending felony matter. CHS-7 testified for the government during a federal trial. CHS-7 has prior felony convictions for aggravated fleeing a law

---

[16] Even those CHS who have already been sentenced could potentially be re-sentenced pursuant to Federal Rule of Criminal Procedure 35 if their information is able substantially to assist the government after their sentencing.

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

enforcement officers and drug distribution. CHS-7 has not received any financial assistance from the FBI. The information CHS-7 provided to the FBI could be viewed as a statement against interest, as CHS-7 admitted to participating in criminal activity. I consider the information CHS-7 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, recorded telephone calls, and physical surveillance.

47.    **CHS-8** is a gang member and drug dealer who has distributed drugs on the street and in jail/prison. CHS-8 has served time at CCCC and is motivated to assist the FBI in hopes of receiving a positive recommendation in a pending felony matter. CHS-8 testified for the government during a federal trial. CHS-8 participated in controlled drug buys and wore a covert recording device during those buys. Information from CHS-8 led to the issuance of eight search warrants, several arrests, the seizure of a dozen firearms, more than $10,000 in U.S. Currency, and controlled substances. CHS-8 has prior felony convictions for armed robbery, burglary, false imprisonment, and drug distribution. CHS-8 has not received any financial assistance from the FBI. The information CHS-8 provided to the FBI could be viewed as a statement against interest, as CHS-8 admitted to participating in criminal activity. I consider the information CHS-8 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, recorded telephone calls, and physical surveillance. To my knowledge, CHS-8's information has not been found to be false or misleading.

48.    **CHS-9** is a gang member and drug dealer who has distributed drugs on the street and in jail/prison. CHS-9 has served time at CCCC and is motivated to assist the FBI in hopes of receiving a positive recommendation in a pending felony matter. CHS-9 testified for the government before a federal grand jury. CHS-9 has prior felony convictions for possession of a controlled substance, auto theft, manslaughter, and a firearms violation. CHS-9 has not received any financial assistance

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

from the FBI. I consider the information CHS-9 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, recorded telephone calls, and physical surveillance. To my knowledge, CHS-9's information has not been found to be false or misleading.

49.     **CHS-10** is a drug dealer who has distributed drugs on the street and in jail/prison. CHS-10 has served time at CCCC and is motivated to assist the FBI in hopes of receiving a positive recommendation in a pending felony matter. CHS-10 does not have any felony convictions and has not received any financial assistance from the FBI. The information CHS-10 provided to the FBI could be viewed as a statement against interest, as CHS-10 admitted to participating in criminal activity. I consider the information CHS-10 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, recorded telephone calls, and physical surveillance. To my knowledge, CHS-10's information has not been found to be false or misleading.

50.     **CHS-11** is a gang associate and has served time at CCCC. CHS-11 provided information to the FBI in hopes of receiving a positive recommendation in a pending felony matter. CHS-11 has prior felony convictions for assault and battery, forgery, identity theft, larceny, conspiracy, battery with a deadly weapon, and a firearms violation. CHS-11 has not received any financial assistance from the FBI. The information CHS-11 provided to the FBI could be viewed as a statement against interest, as CHS-11 admitted to participating in criminal activity. I consider the information CHS-11 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, recorded telephone calls, and physical surveillance. To my knowledge, CHS-11's information has not been found to be false or misleading.

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

51.    **CHS-12** is a drug dealer who has distributed drugs on the street and in jail/prison. CHS-12 has served time at CCCC and was motivated to assist the FBI in hopes of receiving a positive recommendation in a then-pending felony matter. CHS-12 has a prior felony conviction for money laundering. CHS-12 has not received any financial assistance from the FBI. The information CHS-12 provided to the FBI could be viewed as a statement against interest, as CHS-12 admitted to participating in criminal activity. I consider the information CHS-12 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, recorded telephone calls, and physical surveillance. To my knowledge, CHS-12's information has not been found to be false or misleading.

52.    **CHS-13** is a drug dealer who has distributed drugs on the street and in jail/prison. CHS-13 has served time at CCCC and is motivated to assist the FBI in hopes of receiving a positive recommendation in a pending felony matter. CHS-13 has prior felony convictions for auto theft, larceny, child abuse, domestic violence aggravated battery, drug distribution, and a firearms violation. CHS-13 has not received any financial assistance from the FBI. I consider the information CHS-13 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, recorded telephone calls, and physical surveillance. To my knowledge, CHS-13's information has not been found to be false or misleading.

53.    **CHS-14** is a gang associate and has served time at CCCC. CHS-14 is motivated to assist the FBI in hopes of receiving a positive recommendation in a pending felony matter. CHS-14 has prior felony convictions for auto theft and a firearms violation. CHS-14 has not received any financial assistance from the FBI. I consider the information CHS-14 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

investigation, recorded telephone calls, and physical surveillance. To my knowledge, CHS-14's information has not been found to be false or misleading.

54.     **CHS-15** is a drug dealer who has distributed drugs on the street and in jail/prison. CHS-15 has served time at CCCC and is motivated to assist the FBI in hopes of receiving a positive recommendation in a pending felony matter. CHS-15 has a prior felony conviction for drug distribution. CHS-15 has not received any financial assistance from the FBI. The information CHS-15 provided to the FBI could be viewed as a statement against interest, as CHS-15 admitted to participating in criminal activity. I consider the information CHS-15 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, recorded telephone calls, and physical surveillance. To my knowledge, CHS-15's information has not been found to be false or misleading.

55.     **CHS-16** has served time at CCCC and is motivated to assist the FBI in hopes of receiving a positive recommendation in a pending felony matter. CHS-13 has a prior felony conviction for a firearm violation. CHS-16 has not received any financial assistance from the FBI. The information CHS-16 provided to the FBI could be viewed as a statement against interest, as CHS-16 admitted to participating in criminal activity. I consider the information CHS-16 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, recorded telephone calls, and physical surveillance. To my knowledge, CHS-16's information has not been found to be false or misleading.

56.     **CHS-17** is a gang member and has served time at CCCC and is motivated to assist the FBI in hopes of receiving a positive recommendation in a pending felony matter. CHS-17 has prior felony convictions for homicide and carjacking. CHS-17 has not received any financial assistance from the FBI. The information CHS-17 provided to the FBI could be viewed as a statement against

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

interest, as CHS-17 admitted to participating in criminal activity. I consider the information CHS-17 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, recorded telephone calls, and physical surveillance. To my knowledge, CHS-17's information has not been found to be false or misleading.

57.    **CHS-18** has served time at CCCC and is motivated to assist the FBI in hopes of receiving a positive recommendation in a pending felony matter. CHS-18 has prior felony convictions for child abuse, domestic violence aggravated battery, vandalism, aggravated stalking, and assault against law enforcement. I consider the information CHS-18 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, recorded telephone calls, and physical surveillance. To my knowledge, CHS-18's information has not been found to be false or misleading.

58.    **CHS-19** is a drug dealer who has distributed drugs on the street and in jail/prison. CHS-19 has served time at CCCC and is motivated to assist the FBI in hopes of receiving a positive recommendation in a pending felony matter. CHS-19 has a prior felony conviction for drug distribution and a firearms violation. CHS-19 has not received any financial assistance from the FBI. I consider the information CHS-19 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, recorded telephone calls, and physical surveillance. To my knowledge, CHS-19's information has not been found to be false or misleading.

59.    **CHS-20** is a gang member and has served time at CCCC and is motivated to assist the FBI in hopes of receiving a positive recommendation in a pending felony matter. CHS-20 has prior felony convictions for auto theft, burglary, shooting at or from a motor vehicle, embezzlement, extreme cruelty to animals, and receiving stolen property. CHS-20 has not received any financial

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

assistance from the FBI. I consider the information CHS-20 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, recorded telephone calls, and physical surveillance. To my knowledge, CHS-20's information has not been found to be false or misleading.

60.    **CHS-21** is a drug dealer who has distributed drugs on the street and is motivated to assist the FBI in reducing crime in Albuquerque. CHS-21 has prior felony convictions for drug distribution and possession. CHS-21 has not received any financial assistance from the FBI. Information provided by CHS-21 has led to the issuance of two federal search warrants, the seizure of substantial quantities of controlled substances, firearms, U.S. currency, and the arrest of at least three felons. I consider the information CHS-21 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, and physical surveillance. To my knowledge, CHS-21's information has not been found to be false or misleading.

61.    **CHS-22** is a drug dealer and gang member who has distributed drugs on the street and in jail/prison. CHS-22 has served time at CCCC and served as a pod rep within the facility. I recruited CHS-22 as a source of information several years ago because I was investigating criminal activities perpetrated by the Sureños and Mexican Mafia in New Mexico. CHS-22 aided me in the collection of evidence against members of the Sureños and SNM gangs. CHS-22 has assisted the FBI in New Mexico and California with gang investigations, and spent several months utilizing a consensually monitored cellular telephone to speak with targets of FBI investigations. CHS-22 has also worn covert recording devices during meetings with gang members and organized crime figures. Information provided by CHS-22 has led to the issuance of 35 federal search warrants, 10 state search warrants, the arrest of multiple suspects, and the recovery of controlled substances,

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

firearms, ammunition and U.S. currency. CHS-22 also provided the FBI with information about serial armed robbery crews and persons believed to be transporting firearms to criminal elements in Mexico. CHS-22 is motivated to assist the FBI to help reduce violent crime and drugs in the community. CHS-22 has prior felony convictions for human trafficking, armed robberies, aggravated battery, and drug distribution. CHS-22 does not have any pending charges and has received approximately $4,000 in financial assistance from the FBI. I consider the information CHS-22 provided to be reliable because much of it was corroborated through law enforcement investigation, wire interception, controlled buys, and physical and electronic surveillance. To my knowledge, CHS-22's information has not been found to be false or misleading.

62.     **CHS-23** is a gang member and drug dealer who has distributed drugs on the street and in jail/prison. CHS-23 has served time at CCCC and served as a pod rep within the facility. CHS-23 was motivated to assist the FBI in hopes of receiving a positive recommendation in a then-pending felony matter. CHS-23 did receive a 5k for their assistance to the government. CHS-23 provided the FBI with information that resulted in the issuance of several search warrants and the recovery of controlled substances, more than a dozen firearms, and multiple arrests. CHS-23 has prior felony convictions for murder, drive-by shooting and drug distribution. CHS-23 has not received any financial assistance from the FBI. The information CHS-23 provided to the FBI could be viewed as a statement against interest, as CHS-23 admitted to participating in criminal activity. I consider the information CHS-23 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, recorded telephone calls, and physical surveillance. To my knowledge, CHS-23's information has not been found to be false or misleading.

63.     **CHS-24** is a gang member and drug dealer who has distributed drugs on the street and in

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

jail/prison. CHS-24 has served time at CCCC and is motivated to assist the FBI in hopes of receiving a positive recommendation in a pending felony matter. CHS-24 has provided information to the FBI that resulted in the issuance of several search warrants and the recovery of controlled substances, firearms, and multiple arrests. CHS-24 has prior felony convictions for burglary, possession of a controlled substance, and being a felon in possession of a firearm. CHS-24 has not received any financial assistance from the FBI. Information CHS-24 provided to the FBI could be viewed as a statement against interest, as CHS-24 admitted to participating in criminal activity. I consider the information CHS-24 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, recorded telephone calls, and physical surveillance. To my knowledge, CHS-24's information has not been found to be false or misleading.

64.    **CHS-25** is a gang member and drug dealer who has distributed drugs on the street. CHS-25 has served time at CCCC and is motivated to assist the FBI in hopes of receiving a positive recommendation in a pending felony matter. CHS-25 does not have any prior felony convictions and has not received any financial assistance from the FBI. I consider the information CHS-25 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, recorded telephone calls, and physical surveillance. To my knowledge, CHS-25's information has not been found to be false or misleading.

65.    **CHS-26** is a gang member and drug dealer who has distributed drugs on the street and in jail/prison. CHS-26 has served time at CCCC and is motivated to assist the FBI in hopes of receiving a positive recommendation in a pending felony matter. CHS-26 has provided information to the FBI that resulted in the issuance of a federal search warrant. CHS-26 does not have any prior felony convictions and has not received any financial assistance from the FBI. The information

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

CHS-26 provided to the FBI could be viewed as a statement against interest, as CHS-26 admitted to participating in criminal activity. I consider the information CHS-26 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, recorded telephone calls, and physical surveillance. To my knowledge, CHS-26's information has not been found to be false or misleading.

66.    **CHS-27** is a drug dealer and gang associate. CHS-27 is motivated to assist the FBI in hopes of receiving a positive recommendation in a pending felony matter. CHS-27 does not have any felony convictions and has received $600 in financial assistance from the FBI. CHS-27 has conducted controlled drug buys and introduced an undercover agent to the subject of an FBI investigation, they have also worn a covert recording device. The information the CHS-27 provided has led to the execution of multiple search and arrest warrants, as well as the seizure of drugs and guns. I consider the information CHS-27 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, recorded telephone calls, and physical surveillance. To my knowledge, CHS-27's information has not been found to be false or misleading.

67.    **CHS-28** is a gang member and drug dealer who has distributed drugs on the street and in jail/prison. CHS-28 is motivated to assist the FBI in hope of avoiding being charged by the FBI for a prior crime, of which the VGTF investigated. CHS-28 has felony convictions for trafficking controlled substances and aggravated assault with a deadly weapon. CHS-28 has provided information to VGTF agents which has been corroborated by independent investigation. CHS-28 has not received any financial assistance from the FBI. The information CHS-28 provided to the FBI could be viewed as a statement against interest, as CHS-28 admitted to participating in criminal activity. I consider the information CHS-28 provided to be reliable because much of it

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

was corroborated through similar source reporting, law enforcement investigation, recorded telephone calls, and physical surveillance. To my knowledge, CHS-28's information has not been found to be false or misleading.

68.    **CHS-29** is drug dealer and close associate to several area gang members. CHS-29 is motivated to assist the FBI for financial gain and to clean up the community. CHS-29 has participated in several controlled drug buys, worn a covert recording devices, and provided information that led to the issuance of more than 25 search warrants. CHS-29's information resulted in the arrest of about two dozen violent gang members and the seizure of a significant number of firearms, hundreds of thousands of U.S. Currency, and distribution quantities of controlled substances. CHS-29 has felony convictions for fraud and shoplifting. CHS-29 has been compensated approximately $12,250 by the FBI for their cooperation. I believe the information provided by CHS-29 to be reliable because much of it has been corroborated by independent investigation, evidence located during the execution of search warrants, controlled evidence purchases, and surveillance. I am unaware of any false or misleading information that CHS-29 has provided.

69.    **CHS-30** is a gang member and drug dealer who has distributed drugs on the street and in jail/prison. CHS-30 has served time at CCCC and is motivated to assist the FBI in hopes of receiving a positive recommendation in a pending felony matter. CHS-30 has prior felony convictions for burglary, possession of a controlled substance, drug distribution, and being a felon in possession of a firearm. CHS-30 has worn a covert recording device and participated in several controlled drug purchases at the direction of the FBI. The information that CHS-30 provided has led to several search warrants, arrests, the seizure of firearms, and a considerable amount of controlled substances. CHS-30 has not received any financial assistance from the FBI. The

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

information CHS-30 provided to the FBI could be viewed as a statement against interest, as CHS-30 admitted to participating in criminal activity. I consider the information CHS-30 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, recorded telephone calls, and physical surveillance. To my knowledge, CHS-30's information has not been found to be false or misleading.

70.     **CHS-31** is a gang member and drug dealer who has distributed drugs on the street and in jail/prison. CHS-31 wore a covert recording device inside a prison facility on behalf of the FBI to collect valuable evidence. CHS-31 has introduced undercover FBI agents to criminal subjects and worn covert recording devices while meeting with the subjects of FBI investigations. CHS-31 has testified in federal court on numerous occasions, to include during pretrial motion hearings and during several jury trials. Information from CHS-31 has been utilized in more than fifty federal search warrants that resulted in dozens of arrests, the seizures of more than 100 firearms, and substantial quantities of drugs and drug proceeds. CHS-31 has felony convictions for murder, armed robbery, aggravated battery, burglary, trafficking a controlled substance, and possession of a controlled substance. CHS-31 has received approximately $75,000 in financial assistance from the FBI. I consider the information CHS-30 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, seizures and arrests, recorded telephone calls, and physical surveillance. To my knowledge, CHS-30's information has not been found to be false or misleading.

71.     **CHS-32** is a CO and does not have any felony convictions. CHS-32 is motivated to assist the FBI to rid CCCC of contraband. CHS-32 has not been paid by the FBI and I consider the information CHS-32 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, recorded telephone calls, and physical

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

surveillance. To my knowledge, CHS-33's information has not been found to be false or misleading.

72.     **CHS-33** is a gang member and drug dealer who has distributed drugs on the street and in jail/prison. CHS-33 is motivated to assist the FBI in hopes of receiving a positive recommendation in a pending felony matter. CHS-33 has prior felony convictions for aggravated battery, burglary, robbery, aggravated fleeing a law enforcement officer, shoplifting, hit and run, and receiving stolen property. CHS-33 has not received any financial assistance from the FBI. The information CHS-33 provided to the FBI could be viewed as a statement against interest, as CHS-33 admitted to participating in criminal activity. I consider the information CHS-33 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, recorded telephone calls, and physical surveillance. To my knowledge, CHS-33's information has not been found to be false or misleading.

73.     **CHS-34** is a gang associate and is motivated to assist the FBI in reducing crime in Albuquerque. CHS-34 has no prior felony convictions and has not received financial assistance from the FBI. I consider the information CHS-34 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, and physical surveillance. To my knowledge, CHS-34's information has not been found to be false or misleading.

74.     **CHS-35** is a gang member and drug dealer who has distributed drugs on the street and in jail/prison. CHS-35 is motivated to assist the FBI in hopes of receiving a positive recommendation in a pending felony matter. CHS-35 testified in a federal grand jury as a government witness. CHS-35 has prior felony convictions for auto theft, receiving stolen property, possession of a controlled substance, and forgery. CHS-35 has not received any financial assistance from the FBI. The

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

information CHS-35 provided to the FBI could be viewed as a statement against interest, as CHS-35 admitted to participating in criminal activity. I consider the information CHS-35 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, recorded telephone calls, and physical surveillance. To my knowledge, CHS-35's information has not been found to be false or misleading.

75.    **CHS-36** is a retired law enforcement officer and citizen informant. CHS-36 is cooperating with the FBI to rid CHS-36's neighborhood of drug activity. CHS-36 previously provided the FBI with information that resulted in the issuance of a search warrant, the recovery of several pounds of methamphetamine, the seizure of multiple firearms, and the arrest of a violent gang member. CHS-36 has no felony convictions and has not received payment as an informant. I consider CHS-36 to be a reliable witness and have been given no reason to doubt CHS-36's information.

76.    **CHS-37** is a drug dealer who has served time at CCCC and was motivated to assist the FBI in hopes of receiving a positive recommendation in a then-pending felony matter. CHS-37 provided information to the FBI that resulted in the issuance of two search warrants, the seizure of bulk quantities of methamphetamine, several firearms, U.S. currency, and the arrest of two violent gang members. CHS-37 has testified against other gang members in federal court. CHS-37 has a prior felony conviction for drug distribution. CHS-37 has not received any financial assistance from the FBI. The information CHS-37 provided to the FBI could be viewed as a statement against interest, as CHS-37 admitted to participating in criminal activity. I consider the information CHS-37 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, recorded telephone calls, and physical surveillance. To my knowledge, CHS-37's information has not been found to be false or misleading.

77.    **CHS-38** is a gang associate. At one time, CHS-38 distributed heroin for the SNM and later

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

utilized SNM members for protection when CHS-38 became a multi-kilogram heroin dealer. Over the past few years, CHS-38 aided the FBI in the collection of evidence against members and associates of the SNM. Information provided by CHS-38 led to the issuance of at least 22 federal search warrants, the arrest of multiple suspects, and the recovery of firearms, ammunition, U.S. currency and significant quantities of controlled substances. CHS-38 is motivated to assist the FBI to help reduce violent crime and drugs in the community. CHS-38 has prior felony convictions for heroin trafficking, burglary, receiving a stolen vehicle and larceny. CHS-38 does not have any pending charges. CHS-38 has received more than $10,000 in financial assistance from the FBI. I consider the information CHS-38 provided to be reliable because much of it was corroborated through law enforcement investigation, controlled buys, and both physical and electronic surveillance. To my knowledge, CHS-38's information has not been found to be false or misleading.

78.    **CHS-39** is a gang member and drug dealer who has distributed drugs on the street and in jail/prison. CHS-39 agreed to assist the FBI when approached by agents. CHS-39 does not have any pending charges. CHS-39 has prior felony convictions for receiving stolen property, burglary, identity theft, credit card theft, domestic violence aggravated battery, and abandonment of a child. CHS-39 has not received any financial assistance from the FBI. The information CHS-39 provided to the FBI could be viewed as a statement against interest, as CHS-39 admitted to participating in criminal activity. I consider the information CHS-39 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, recorded telephone calls, and physical surveillance. To my knowledge, CHS-39's information has not been found to be false or misleading.

79.    **CHS-40** is a drug dealer who has served time at CCCC and is motivated to assist the FBI

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

in hopes of receiving a positive recommendation in a pending felony matter. CHS-40 does not have any felony convictions and has not received any financial assistance from the FBI. The information CHS-40 provided to the FBI could be viewed as a statement against interest, as CHS-40 admitted to participating in criminal activity. I consider the information CHS-40 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, recorded telephone calls, and physical surveillance. To my knowledge, CHS-40's information has not been found to be false or misleading.

80.    **CHS-41** is a gang member and drug dealer who has distributed drugs on the street and in jail/prison. CHS-41 is motivated to assist the FBI in hopes of working as an FBI CHS upon CHS-41's release from jail. CHS-41 has prior felony convictions for auto theft, forgery, being a felon in possession of a firearm, and possession of a controlled substance. CHS-41 has not received any financial assistance from the FBI. The information CHS-41 provided to the FBI could be viewed as a statement against interest, as CHS-41 admitted to participating in criminal activity. I consider the information CHS-41 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, recorded telephone calls, and physical surveillance. To my knowledge, CHS-41's information has not been found to be false or misleading.

81.    **CHS-42** is a gang member who has served time at CCCC and has cooperated with the FBI in the past. CHS-42 testified for the government during a racketeering-murder trial and is motivated to continue assisting the FBI when requested to do so. CHS-42 does not have any pending charges and has not received any financial assistance from the FBI. CHS-42 has prior felony convictions for racketeering, aggravated battery, possession of a weapon by a prisoner, aggravated assault on a law enforcement officer, and battery upon a peace officer. I consider the

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

information CHS-42 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, recorded telephone calls, and physical surveillance. To my knowledge, CHS-42's information has not been found to be false or misleading.

82.     **CHS-43** is a gang member who has served time at CCCC and has cooperated with the FBI in the past. CHS-43 does not have any pending charges and has not received any financial assistance from the FBI. CHS-43 has prior felony convictions for trafficking drugs, escape from custody, probation violation, and aggravated fleeing a law enforcement officer. I consider the information CHS-43 provided to be reliable because much of it was corroborated through similar source reporting, law enforcement investigation, recorded telephone calls, and physical surveillance. To my knowledge, CHS-43's information has not been found to be false or misleading.

**FACTS AND CIRCUMSTANCES ESTABLISHING PROBABLE CAUSE
TO SEARCH THE TARGET SUBJECTS AND SUBJECT PREMISES**

83.     Several of the Target Subjects, to include NORA BACA, ESTRELLA GONZALEZ, ANGELO GARCIA, MONALISA VARGAS, THERESA ATENCIO, JOHNNY VALITERRA, aka: "CHOPPER," RICHARD PORRAS, aka: "DEUCE," SONIA TRINIDAD, DESIREE BENAVIDEZ, ANA ROMERO, ADOLFO MONTANO, KIMBERLY PERRY, KELLY PERRY, MONIQUE GALLEGOS, DAVID HICKS and others, are suspected of conspiring to distribute controlled substances within the District of New Mexico. The Target Subjects are working with one another, and/or with others to introduce controlled substances and contraband cellular telephones to inmates at CCCC. In the paragraphs that follow, I have outlined the primary drug distribution schemes in which the Target Subjects are believed to be involved.

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

**Nora Baca, the Aryan Brotherhood, and Prison Gangs**

84.    Over the past few years, VGTF agents have observed NORA BACA to be a suspected distributor of multi-pound quantities of methamphetamine and an associate of both the AB and SNM prison gangs.[17] In late 2022 and early 2023, the VGTF began targeting BACA's drug trafficking activities.

85.    In February 2023, the VGTF and FBI SWAT team executed a search warrant at BACA's residence. The warrant was in furtherance of a drug trafficking investigation targeting AB members and associates in Albuquerque. BACA was not home when the warrant was executed; however, agents located two firearms, methamphetamine, and an individual who admitted to being associated with an AB member. The AB associate was arrested for being a felon in possession of a firearm.

86.    In May 2023, the VGTF and FBI SWAT team executed a search warrant on BACA's new residence, Subject Premises A-1. The warrants authorized agents to search the premises for evidence of drug distribution. BACA was not home when the warrant was executed; however, agents located five pounds of methamphetamine, 1,000 fentanyl pills, $29,000 in cash, three firearms and a ballistic vest. Several people were inside the residence when the SWAT team cleared it, to include an individual who admitted to being an AB associate. The AB associate was arrested and charged with federal drug and firearm charges.

87.    On September 10, 2024, BACA was indicted by a Federal Grand Jury and charged with possession with intent to distribute methamphetamine and fentanyl, and possession of a firearm in furtherance of a drug trafficking crime, Case No. 23-CR-953-KWR.

---

[17] BACA was in a relationship with an SNM member and associated with other members. BACA was also in regular communication with a validated Aryan Brotherhood of Texas (ABT) leader who was living in Albuquerque after his release from federal prison.

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

88.    Numerous CHS have reported BACA is living at and selling controlled substances from Subject Premises A-1.

89.    CHS-9 reported having purchased distribution amounts of methamphetamine from BACA on numerous occasions in recent years.

90.    CHS-9 indicated BACA was a consistent source of supply for methamphetamine and had connections with the cartel.

91.    CHS-9 did not know BACA to earn income via any other manner, other than drug sales.

92.    CHS-9 knows BACA to reside at Subject Premises A-1.

93.    CHS-35 purchased distribution amounts of methamphetamine from BACA on numerous occasions in recent years.

94.    CHS-35 described BACA as having a good reputation within the drug-trade around Albuquerque and being connected to several powerful gang members.

95.    CHS-35 reported BACA had placed a hit on one of her former drug customers who was incarcerated at CCCC because she suspected the former client was cooperating with the government.

96.    CHS-35 knows BACA to reside at Subject Premises A-1.

97.    Within the last month, CHS-36 reported BACA currently lives at Subject Premises A-1 and is selling drugs from the location. CHS-36 regularly observes numerous persons and vehicles visit BACA at all hours of the day and night at Subject Premises A-1. CHS-36 described the visitors typically approached the front door and remained for 10 minutes or less before departing the premises.  CHS-36 has witnessed numerous persons exit Subject Premises A-1 and use drugs in front of the location before driving away in vehicles._CHS-36 has observed used drug paraphernalia (described as glass pipes, tin foil, straws, and lighters) on the street in front of

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

Subject Premises A-1.

98.    CHS-37 reported BACA had gotten rid of her gray vehicle and was now driving a maroon Mercedes SUV. CHS-37 reported having purchased distribution amounts of methamphetamine from BACA on numerous occasions in recent years. CHS-37 indicated BACA always had meth for sale and was tied into a Mexican source of supply.

99.    Within the last month, CHS-38 said BACA is currently selling methamphetamine in multi-pound quantities from Subject Premises A-1. CHS-38 has known BACA for many years and previously sold drugs with BACA and other SNM associates. CHS-38 reported BACA is aware she is an FBI investigative target and likely going to be indicted for trafficking methamphetamine.

100.    On September 19, 2024, BACA communicated with a federal inmate at CCCC and said, "Guess what dude I'm getting indicted for meth trafficking. Two dudes are telling on me. The white dude. They gave sworn testimony against me." BACA did not want to say the name of the witnesses over the phone but subsequently provided one of the alleged witnesses' nicknames. BACA and the CCCC inmate discussed details of the grand jury investigation and which persons may be testifying against her. The CCCC inmate inquired several times about who the rat was and BACA said the guy was locked up at the Estancia Detention Center. The CCCC inmate thought one of the witnesses might still be at CCCC. The inmate asked BACA how she knew she was going to be indicted and BACA said she cannot tell, but reiterated she is sure she will be.

101.    CHS-2, 4, 5, 8, 11, 12, 13, 14, 17, 18, 22, 23, 24, 27, 28, 29, 30, 32, 40 and 42 reported that inmates often had people on the outside moving drugs and money or helping those inmates obtain drugs while inside the facility.

### Estrella Gonzalez's Support for the Nuevo Car

102.    On June 1, 2024, JERRY BEZIE, aka: "GIZMO," was incarcerated at CCCC. In the early

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

morning hours, BEZIE and three other inmates manipulated the locking mechanism on their cell doors and exited their cells. BEZIE and the three inmates rushed a CO and BEZIE punched the CO in the face.

103.    In the below photograph, BEZIE is observed behind the CO, while the CO had his arms around USMS inmate VALENTIN GARCIA. Another CCCC staff member, a female, appears extremely upset and scared as she tried to gain distance from the inmates. USMS inmate DONOVAN YOUNG is observed grabbing the medical cart.



Starting at the door, USMS inmate ANTHONY MONTANO (wearing the mask), USMS inmate JERRY
BEZIE (backwards hat), CO, USMS inmate VALENTIN GARCIA, and USMS inmate DONOVAN YOUNG
(white shirt with glasses).

104.    In the below photograph, BEZIE is observed punching the CO, while GARCIA continued

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

to fight with the CO and YOUNG moved the cart towards the door and back into the pod.



USMS inmate BEZIE striking a CCCC CO, while USMS inmate GARCIA is fighting with the officer and USMS inmate GARCIA takes a medical cart.

105.    BEZIE is known to agents because on March 23, 2023, FBI SWAT and VGTF agents executed a search warrant at Subject Premises A-2. The residence of Thugs Causing Kaos ("TCK") gang member BEZIE and his girlfriend, Target Subject ESTRELLA GONZALEZ. Agents encountered both subjects and their four children at the residence. GONZALEZ exited the residence during the knock and announce phase. BEZIE remained inside the home and was

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

observed exiting the master bedroom. SWAT agents contacted BEZIE and detained him. During a search of the residence, agents located the following items in the shared bedroom of BEZIE and GONZALEZ:

      a) Sixteen pounds of methamphetamine,

      b) Fentanyl pills around the toilet,

      c) 146.8 grams of Xanax pills,

      d) five firearms and ammunition,

      e) $64,000 in U.S. currency,

      f) a gold-colored money counting machine, and

      g) seven cellular telephones.

106.　More than 114,000 (25 pounds) of fentanyl pills were located inside a diaper box on the backseat of BEZIE's Hummer H2, which was parked in front of the house. BEZIE was indicted by a Federal Grand Jury and charged with possession with intent to distribute controlled substances, possession of a firearm in furtherance of drug trafficking, and being a felon in possession of a firearm and ammunition, Case No. 1:23cr589. BEZIE is in custody at CCCC pending trial. GONZALEZ was arrested by APD officers for possession of fentanyl.

107.　VGTF agents subsequently searched ESTRELLA GONZALEZ's cell phone and found several text messages that demonstrated GONZALEZ was selling drugs to other people. GONZALEZ's cell phone also contained numerous photos of fentanyl and Xanax pills in large piles in what appear to be bowls, plates, tabletops, and countertops.

108.　Within the last few weeks, several CHS have reported GONZALEZ continues to distribute controlled substances on the street and has been a consistent source of supply for Nuevo members in CCCC. GONZALEZ is believed to be aiding her boyfriend JERRY BEZIE and associate JESSE

### AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

YOUNG, aka: "LOBO," who are incarcerated at CCCC. The VGTF arrested YOUNG during a racketeering investigation into the WSL. The search warrants were executed on September 1, 2022, and resulted in the arrest of YOUNG and the seizure of 1.1 million fentanyl pills, 147 pounds of methamphetamine, 37 firearms, ammunition, nine ballistic vests, five vehicles, and several $1.8 million in cash. YOUNG was indicted by a Federal Grand Jury and charged with possession with intent to distribute methamphetamine, possession with intent to distribute fentanyl, possession of a firearm in furtherance of a drug trafficking crime, and felon in possession of a firearm and ammunition, Case No. 1:22cr1582-WJ.

109.    One of the vehicles located at YOUNG's residence was registered to ATENCIO. When asked, YOUNG stated that he received the vehicle (which was registered to ATENCIO) as a payment for drugs.

110.    CHS-2 reported GONZALEZ has been aiding BEZIE distribute Suboxone inside CCCC since BEZIE's incarceration began.

111.    CHS-4 reported that GONZALEZ was sending drugs into CCCC, destined for BEZIE and YOUNG.

112.    CHS-21 reported that GONZALEZ sells fentanyl, and lives at Subject Premises A-2.

113.    Within the last two weeks, CHS-27 reported that GONZALEZ is sending drugs into CCCC, to BEZIE and YOUNG. CHS-27 reported that GONZALEZ still lived at Subject Premises A-2. CHS-27 reported that GONZALEZ was helping BEZIE distribute drugs in Albuquerque, from Subject Premises A-2.

114.    CHS-17 reported that inmates often had people on the outside moving drugs for the inmates.

115.    CHS-7, 29, 23, and 30 reported many fights occurred at CCCC, which were most often

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

drug related.

116.    CHS-2, 4, 5, 8, 11, 12, 13, 14, 17, 18, 22, 23, 24, 27, 28, 29, 30, 32, 40 and 42 reported that inmates often had people on the outside moving drugs and money or helping those inmates obtain drugs while inside the facility.

117.    CHS-5, 8, 10, 12, 17, 18, 19, 20, 23, 29, 39, and 42 reported inmates use CashApp to pay for drugs and the CashApp accounts are maintained by the inmate's family or friends.

118.    CHS-5, 8, 9, 10, 11, 12, 13, 14, 18, 19, 20, 22, 23, 24, 25, 29, 32, 40, 41 and 42 reported that there were dirty COs at CCCC, who would smuggle drugs and other contraband in for inmates.

119.    CHS-5, 10, 13, 14, 23, 29, and 39 reported that they knew of inmates with a cell phone, a smart phone, and believed that the inmates checked their CashApp via the contraband cell phone.

120.    CHS-3, 10, 12, 14 reported that inmates with jobs within CCCC could more easily get cell phones and deal drugs.

### Inmates Directing Drug Trafficking on the Street

121.    VGTF agents have received recorded jail calls between ANGELO GARCIA (hereinafter "FATHER") and his son ANGELO GARCIA, Jr. (hereinafter "SON") from officers with the MDC STIU.[18] STIU members notified the VGTF that STIU has identified multiple inmates involved in selling illegal spice paper[19] in the jail. During the course of this specific investigation, agents determined that SON was also utilizing Instagram account "_lopacs." Agents identified the Instagram account by comparing the MVD photograph of SON to the individual posting pictures of himself on the aforementioned account.

---

[18] The FBI's VGTF and STIU have worked in conjunction to mitigate gang activity that transpires between the jail and street crime as they are often directly associated as criminal relationships form on both fronts.

[19] Based on my training and experience, "spice paper" is a synthetic cannabinoid sprayed or otherwise infused onto paper, commonly smuggled into prisons for inmates to smoke and get high.

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

122.    The inmates identified by STIU as selling spice paper in the jail are as follows: FATHER, who is incarcerated at MDC on a pending charge of possession of a firearm by convicted felon, ISAAC MARTINEZ, who is incarcerated at MDC on a pending charge of murder in the first degree, and GILBERT SALAZAR, who is incarcerated at MDC on a pending charge of murder in the first degree.

123.    STIU officers subsequently informed VGTF agents that all three inmates were receiving spice paper from SON. All three inmates were contacting SON via the same phone number, which was subsequently blocked by MDC.

124.    SON then began utilizing a different number, which FATHER utilized to contact SON. The manner in which FATHER contacted SON was by calling unwitting, who then merged calls with SON. In my training and experience, inmates often utilize third party, or merged, calls so as to avoid detection by facility investigators.

125.    Outgoing calls from MDC are recorded and a preamble statement to the users of the call advises those participants that calls are subject to monitoring and recording. Agents and STIU investigators listened to multiple recorded calls, which captured FATHER and SON, spanning from April 2024 to the present. A brief synopsis from some of those calls follow:

126.    On April 25, 2024, FATHER contacted SON.

FATHER advised SON not to talk to too many people and to get money for him. FATHER then asked SON what his mom thought the "food stamps[20] were going for, like three?"

SON: "two or three."

FATHER: "To beat everybody else like one seventy five, but, because I mean if you're

---

[20] Food Stamps, in this context, are code for Fentanyl pills. From my training and experience, I know that persons involved in narcotics trafficking often speak in code in an attempt to avoid law enforcement detection.

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

getting them at five then that means you're gonna get like uh uh like seventeen."

FATHER: "She was gonna front them to me, but, those food stamps but uh like if I have the money all up front she'll uh still charge five or six."

SON: "usually if you have the money up front its five."

FATHER then advised SON to only deal with trustworthy people and that the family is depending on him.

SON: "I just stay at the house."

127.    Based on my training and experience, the term "food stamps" is code for fentanyl pills and FATHER and SON were discussing the price per fentanyl pill. In the example above provided by FATHER and SON, SON appears to be getting 1,000 pills at a rate of $500.00. If SON then sold the pills for $1.75 each, the total would be $1,750.00. Therefore, SON would have made $1,250 on the 1,000 pills.

128.    The prices and profits above are common and consistent with fentanyl dealing I have observed in past narcotics deals. Based on my training and experience, the term "front" is commonly used in narcotics dealing to indicate a person was given narcotics to sell prior to payment. If a person is to be "fronted", that generally means they have trust and reliability within the drug network.

129.    On May 6, 2024, FATHER contacted SON

FATHER asked SON if he was "almost done."

SON advised he was on his "second one." SON then told FATHER that he had his own people.

FATHER advised SON, "it's better just to do a few people and that's it."

The two then discussed pricing even further. SON stated, "I was gonna do uh a dollar uh

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

thirty or forty."

FATHER later directed SON, "if you get a good amount of food stamps tell him you'll do them for a dollar thirty no less than that."

The call ended with FATHER telling SON, "Don't have no kind of money on you when you, when you, when you leave the house."

130.    Based on my training and experience and based on the above described calls, wherein FATHER counseled SON to keep a trusted customer base for narcotics sales.

131.    On June 13, 2024, one of SON's Instagram accounts, "315.lopacs," posted a story which displayed a large amount of cash. Take note of the gold chain with a Jesus pendant resting on top of the stack of cash.



Photograph posted by SON, to his Instagram account, of a large stack of cash and a gold chain adorned with a Jesus pendant.

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

132.    Agents also located photographs of SON, wearing the above Jesus pendant and gold chain,

holding a Glock pistol with a laser and a drum magazine, the photograph was also posted by SON

to his Instagram account.



A selfie, taken by SON, wearing the Jesus pendant and gold chain, holding a Glock pistol with drum
magazine and laser.

133.    On July 2, 2024, FATHER contacted SON and instructed him not to sell on the internet

because four guys just got arrested by selling online. SON responded, "I don't go texting people

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

online like that, I already know." Based on my training and experience, FATHER was cautioning

SON not to use social media as a means to advertise and distribute narcotics.

134.     On July 6, 2024, SON posted another selfie of himself wearing the Jesus pendant and gold

chain.



A selfie of SON wearing the Jesus pendant and gold chain.

135.     On July 16, 2024, FATHER contacted SON.

SON told FATHER that people bought from him and will continue to buy from him

because "I have the best ones."

FATHER then advised SON not to trust an individual who just got off probation. FATHER

then asked SON, "is she coming to get a large amount, like a lot of money?"

SON: "Little bit."

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

FATHER: "How much do you charge her, seven?"

SON: "Eight."

FATHER: "For a whole one?"

SON: "Yeah."

FATHER: "oh yeah you're making three on each one."

SON: "No."

FATHER: "You're getting them for five?"

SON: "Not no more they went up a little bit."

FATHER: "Six."

SON: "yeah."

FATHER: "Fuck man that's still good. Don't ever give nobody that price ever." FATHER later stated, "If you're gonna get more than two or three than I can give them to you can get them for eight, 750, eight." FATHER later stated, "Is she doing them? I'm gonna be on her on her if she's doing them."

136.   Based on my training and experience, Son referencing that he has, "the best ones," is a reference to high quality fentanyl pills. Narcotics distributors can maintain a customer base with quality narcotics but can lose customers and credibility if the narcotics are of low quality. Based on my training and experience, the term "whole one" is a common reference to a "boat" of fentanyl pills which is a pill quantity of 1,000. The prices discussed are common and consistent with fentanyl pill distribution.

137.   On September 19, 2024, I reviewed the contacts and discovered that the phone number which SON utilized was in communication with a number (hereinafter "Co-Conspirator") captured in a separate VGTF investigation. SON had made more than 202 contacts with Co-Conspirator

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

between June 2024 and present, and as recent as October 18, 2024. SON's phone has been in service since April 27, 2024.

138.    I am aware that Co-Conspirator's associate has engaged in narcotics distribution which later resulted in seizures of narcotics and arrests in the separate VGTF investigation.

139.    CHS-1 reported FATHER and SON regularly send drugs into MDC and CCCC to other members of the Nuevo car. CHS-1 maintains contact with SON and some of his 14th Street gang associates and knows SON to always maintain a large quantity of fentanyl pills on his person.

140.    CHS-1 knows SON to sell fentanyl from Subject Premises A-3. CHS-1 knows FATHER to currently distribute Suboxone and other controlled substances inside MDC with the help of SON, who sends the drugs to FATHER.

141.    CHS-15 reported persons associated with the Mexican DTOs and Paisa car were the primary drug source of supply for Albuquerque dealers and gangs, to include the 14th Street gang.

142.    CHS-19 reported inmates use CashApp to pay for drugs and the CashApp accounts are maintained by the inmate's family or friends. Several COs at CCCC are dirty and bring drugs into the jail.

143.    CHS-29 has known SON for several years and reported SON is distributing fentanyl and methamphetamine from Subject Premises A-3 daily. CHS-29 has purchased drugs and introduced drug buyers to SON on several occasions.

144.    CHS-2, 4, 5, 8, 11, 12, 13, 14, 17, 18, 22, 23, 24, 27, 28, 29, 30, 32, 40 and 42 reported that inmates often had people on the outside moving drugs and money or helping those inmates obtain drugs while inside the facility.

145.    CHS-5, 8, 10, 12, 17, 18, 19, 20, 23, 29, 39, and 42 reported inmates use CashApp to pay for drugs and the CashApp accounts are maintained by the inmate's family or friends.

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

146.    CHS-5, 8, 9, 10, 11, 12, 13, 14, 18, 19, 20, 22, 23, 24, 25, 29, 32, 40, 41 and 42 reported that there were dirty COs at CCCC, who would smuggle drugs and other contraband in for inmates.

147.    CHS-5, 10, 13, 14, 23, 39 reported that they knew of inmates with a cell phone, a smart phone, and believed that the inmate checked their CashApp via the contraband cell phone.

148.    CHS-3, 10, 12, 14 reported that inmates with jobs could more easily get cell phones and deal drugs.

### The August 10, 2024, Throw Over

149.    On August 10, 2024, at approximately 5:50 am, CCCC officers located a package on the ground in the rec yard, near the perimeter fence. Officers routinely find drug packages on the rec yard, particularly near the truck stop. The package contained:

     a)  26 grams of heroin,

     b)  two cell phones and charging cords,

     c)  lighters,

     d)  syringes,

     e)  62 grams of tobacco, and rolling papers,

     f)  one sheet of paper soaked in synthetic cannabinoids,

     g)  218 strips of suboxone, and

     h)  and 56 grams of THC wax.

150.    CoreCivic Intel Unit officers were made aware of the seizure of the package and investigated its origin. Through the review of CCCC inmate telephone calls, investigators learned the drug package was intended for CCCC federal inmates LUPE VARGAS, aka: "LOKS," and

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

EDWARD VALLEZ, aka: "DOPEY."[21] The recorded calls revealed LUPE VARGAS and VALLEZ had MONALISA VARGAS (wife of LUPE VARGAS) and MICHAEL GARCIA, aka: "GOMER," obtain the contraband items and throw them over the fence. At the time, LUPE VARGAS and VALLEZ were cell mates, and their cell faced the fence in an area where the external perimeter fence was close to the building.

151.    It was easy for investigators to identify MONALISA VARGAS, as her phone number was registered through the facility to her. Agents were familiar with GARCIA and knew him to be an active drug dealer in Albuquerque and an Albuquerque Police Department "Metro Top 15 fugitive."

152.    This is not the first time GARCIA's voice has been captured on a recorded jail call, as agents previously reviewed jail calls from MDC that captured conversations between GARCIA and LUPE VARGAS. Several FBI special agents and an MDC STIU investigator listened to the calls side by side, and believe GARCIA was the person identified as "Michael" and "Gomer" in the recorded CCCC telephone calls leading up the August 10, 2024, throw-over.

153.    Case agents reviewed recorded jail calls from CCCC and learned that between the hours of 12:30 am and 06:00 am on August 10, 2024, LUPE VARGAS placed fourteen calls to his wife, MONALISA VARGAS, wherein he provided her with directions to the truck stop location to park and how to throw the package over the fence.[22] In the first recorded call, MONALISAVARGAS asked LUPE VARGAS if he remembered her problem at night, he said yes and asked if her brother

---

[21] I am familiar with inmates LUPE VARGAS, aka: "LOKS," and EDWARD VALLEZ, aka: "DOPEY," as both are Albuquerque gang members facing federal charges resulting from FBI investigations. In 2023, VALLEZ was arrested by the VGTF after more than 200,000 fentanyl pills and $100,000 cash was found in his vehicle. VALLEZ was later indicted by a Federal Grand Jury for possession with intent to distribute fentanyl, Case No. 1:23-cr-00749-WJ. VARGAS was later indicted by a Federal Grand Jury for carjacking and possession of a firearm by a convicted felon, Case No. Case 1:24-cr-00712-MLG.
[22] MONALISA VARGAS may have been accompanied by an unidentified female co-conspirator. Agents are working to identify this individual.

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

was going to help, she responded yes. LUPE VARGAS also advised her that she would need help throwing the package over. Through our review of the recorded calls, we learned MONALISA VARGAS and GARCIA obtained the drugs and other contrabands together, drove to CCCC, attempted to identify the location where VALLEZ and LUPE VARGAS wanted the drugs thrown over the fence, and finally argued about the package landing in the wrong spot.

154.    I believe MONALISA VARGAS did not understand the directions and subsequently had VALLEZ speak with GARCIA. VALLEZ provided GARCIA with directions and instructions on how to get close to the CCCC fence and where they should throw the package over the fence.

155.    Once they got to the area of the facility, MONALISA VARGAS reported to LUPE VARGAS that she thought a nearby vehicle was watching her, and that she did not want to draw attention to herself. LUPE VARGAS tried to direct MONALISA VARGAS and GARCIA to the area closest to LUPE VARGAS' jail cell. LUPE VARGAS also whistled loudly and shined a light out the window of his jail cell, or a nearby window. MONALISA VARGAS eventually acknowledged seeing the light.

156.    At one point, LUPE VARGAS told MONALISA VARGAS to throw the package over the fence with a fishing rod so LUPE VARGAS could pull the fishing line into his cell. LUPE VARGAS also requested MONALISA VARGAS tape the package up really good and attach a string to it so he could pull it in.

157.    Eventually, MONALISA VARGAS and GARCIA got to the area LUPE VARGAS had guided them to. MONALISA VARGAS again voiced concerns about a nearby vehicle that might be conducting surveillance. LUPE VARGAS encouraged her to continue with the package delivery. LUPE VARGAS again offered advice on how to deliver the package. MONALISA VARGAS said GARCIA did not want to utilize a fishing rod. LUPE VARGAS said if they could

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

get the package near his room, he would be able to recover it. LUPE VARGAS asked if they (MONALISA VARGAS and GARCIA) had brought the fishing rod and MONALISA VARGAS said yes. MONALISA VARGAS and LUPE VARGAS conversed about the timing of the throw-over and the fact that a suspicious vehicle was nearby and they needed to wait. LUPE VARGAS conversed with other inmates in or around his cell and they commented that they (the inmates) could see GARCIA and MONALISA VARGAS outside. Shortly thereafter the inmates sounded surprised and exclaimed that MONALISA VARGAS and GARCIA had thrown the package the wrong way! The inmates could be heard cursing and said they (MONALISA VARGAS and GARCIA) had thrown the package all the way to the right. LUPE VARGAS then became very upset.

158.    A CCCC closed-circuit surveillance system captured MONALISA VARGAS throw the package over the fence. On the video, MONALISA VARGAS is observed on the phone, and it captured the throw over of the package into Zone 6 of the perimeter fence. The package can be seen bouncing on the ground inside the fence-line. The package was recovered by facility staff and contained the above listed items.

159.    At the time of the throw over, both VALLEZ and LUPE VARGAS were inside their shared cell. After the throw over, VALLEZ called THERESA ATENCIO and discussed the fact that the package had been seized by CCCC. During this recorded call, VALLEZ instructed ATENCIO to shut off a cell phone that was intended for VALLEZ. ATENCIO told VALLEZ the phone could not be shut off because $400 had been put on the phone for four months of activation. VALLEZ then told ATENCIO to have the cell phone account switched to someone or something else. VALLEZ then told ATENCIO to schedule a visit for the coming Thursday. Based on my training and experience, I believe Atencio was involved in the throw over plan earlier, and would have

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

been aware that Monalisa Vargas intended to throw drugs over the fence.

160.    Following the failed package delivery, LUPE VARGAS called MONALISA VARGAS multiple times. GARCIA told LUPE VARGAS they had thrown the package exactly in the direction LUPE VARGAS had requested. LUPE VARGAS responded by telling them they threw it all the way to the right. MONALISA VARGAS then said the package had landed next to the wall like he wanted, and that it was next to the door. She continued, telling LUPE VARGAS that the package was next to the door. LUPE VARGAS responded in disbelief, saying that he could not open the door because he was in jail.

161.    In mid-September 2024, LUPE VARGAS attempted to send a letter to MONALISA VARGAS at Subject Premises A-2. Interestingly enough, the letter was addressed to ESTRELLA GONZALEZ at Subject Premises A-2. LUPE VARGAS writes about the price and methods to introduce drugs. LUPE VARGAS also accuses MONALISA VARGAS of pinching from the package that she and GARCIA threw over the fence. LUPE VARGAS expanded, explaining that he saw the incident report and photographs of the drugs on the scale and it was less than they ordered, he surmised that MONALISA VARGAS stole some of the drugs before throwing the package over the fence.

162.    On October 22, 2024, MONALISA VARGAS and GARCIA were indicted by a Federal Grand Jury for Attempt to Provide a Prohibited Object to an Inmate of a Prison and Conspiracy to do the same, contrary to 18 U.S.C. section 1791(a)(1) and section 371, respectively.

163.    Within the last six weeks, CHS-38 reported MONALISA VARGAS was selling controlled substances for GARCIA.

164.    Within the last six weeks, CHS-33, 34, and CHS-38 reported that MONALISA VARGAS lives and sells fentanyl from Subject Premises A-4

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

165. CHS-31 reported that THERESA ATENCIO lives and sold drugs from Subject Premises A-5.

166. Within the last six weeks, CHS-2 reported MONALISA VARGAS helped LUPE VARGAS obtain drugs at CCCC so that he could sell them to other inmates. CHS-2 reported the details of the August 2024 throw-over to case agents and said MONALISA VARGAS and a male caused the drugs to be thrown over the CCCC fence and into the rec yard.

167. CHS-5 reported that inmates could obtain significant amounts of drugs and cellphones inside CCCC, and they could still run drug trafficking operations on the streets while being incarcerated at CCCC.

168. CHS-10 reported that they knew of inmates with a cell phone, a smart phone, and believed that the inmate checked their CashApp via the contraband cell phone.

169. CHS-17 reported that inmates arranged for meth to be smuggled into CCCC by runners. The runners would throw handballs, or packages concealing methamphetamine, over the fence into the yard.

170. CHS-14 reported that inmates would coordinate drug drops with people on the outside and COs. The COs would then smuggle the drugs into the facility. CHS-14 reported that the cell phones that inmates were using were already activated upon their introduction to CCCC. CHS-14 reported that often times, inmates would utilize the cell phones to communicate with COs regarding the smuggling of drugs into CCCC. The cell phones were also used to communicate with other units within CCCC.

171. CHS-14 reported that inmates would coordinate with people on the outside to throw drugs over the fence, as a way to introduce them to CCCC. CHS-14 explained that the inmates would coordinate the time and place for the people to park and when and where to throw the package

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

over the fence, so that the inmates could positively retrieve the package.

172.    CHS-23 reported that girlfriend of LUPE VARGAS, aka: "LOKS," threw a package of drugs over the fence, destined for LUPE VARGAS and EDWARD VALLEZ.

173.    CHS-23 reported that inmates obtain drugs via throw overs, defendants who turn themselves in, and via blind drops while inmates are at the hospital.

174.    CHS-40 reported that there are COs who smuggle dope into the facility.

175.    CHS-23, 28, 30, and 40 reported that ESTRELLA GONZALEZ sent drugs into CCCC for inmates JERRY BEZIE and JESSE YOUNG.

176.    CHS-2, 4, 5, 8, 11, 12, 13, 14, 17, 18, 22, 23, 24, 27, 28, 29, 30, 32, 40 and 42 reported that inmates often had people on the outside moving drugs and money or helping those inmates obtain drugs while inside the facility.

177.    CHS-5, 8, 10, 12, 17, 18, 19, 20, 23, 29, 39, and 42 reported inmates use CashApp to pay for drugs and the CashApp accounts are maintained by the inmate's family or friends.

178.    CHS-5, 8, 9, 10, 11, 12, 13, 14, 18, 19, 20, 22, 23, 24, 25, 29, 32, 40, 41 and 42 reported that there were dirty COs at CCCC, who would smuggle drugs and other contraband in for inmates.

179.    CHS-5, 10, 13, 14, 23, 39 reported that they knew of inmates with a cell phone, a smart phone, and believed that the inmate checked their CashApp via the contraband cell phone.

180.    CHS-3, 10, 12, 14 reported that inmates with jobs could more easily get cell phones and deal drugs.

**Lupe Vargas' Plan to Obtain a Gun and Escape**

181.    LUPE VARGAS, aka: "LOKS," was previously incarcerated at MDC. While at MDC, he attempted to send MONALISA VARGAS (his wife) a letter pleading for her to get him a handcuff key, drugs, and a gun so he could escape. In the letter he detailed a plan to escape from the UNM

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

Hospital during a medical visit. In the letter, LUPE VARGAS included a map to aid in the escape

plan. MDC STIU investigators intercepted the letter. I have included photographs of the letter

below.

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**



ast on lomas From Free-way make very First Rig
up Sighen Fallow the street all the way back the build
1st Keep fallowin it ʒ it'll be ur last right turn in
ht ur Facen 2 the west. go in the bathroom
Seen as you walk in So either put under the toilet
lid taped under or under the toilet by the wall
even a cuFF
Key if you d
I'll run or
put a Strap
in the tolet
trash or unde
the tank lid
taped with a
good tape like
grilla tape.
Call Sandra
ask 2 look
make shure i
stays on the
4th of April
@ 9:00 but
B there @ 8:
Sharpe please
I don't want
iss you

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

I reather be home it's 18 ment's if I go but who gives a Fuck / germs or any body who is down talk let's see if we can get 2 homies 2 handle it. Tell gomer 2 give me a gun 2 get out if I cant get it'll just go pick it up or wait in the waitting room & watch it all go down. I love you mensa dont be Scared let's handle this or let's get payed.

Lobo: Are you down ? if so let's get payed. I'll pay you 2 do this all you get 2 do is stay covered ↑ & dont Say Fuck my wife will even do it with you the other aint 100% shure I'll get out inless I get a cuff key. just let's get out Fuck the %o they aint going to Say Fuck

or if they dont lock the van door just put it on the lil area they put S+G on the side of vans all you got 2 do is tape it 2 the side or the top So when I get in & Sit ↓ I'll be Facen it on the Top I typed already I'll be able 2 reach it if

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**



**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

**Loading up Violators with Drugs for Introduction to CCCC**

182.    Numerous CHS described to the investigative team a scheme in which persons on federal pretrial supervision or post-prison supervision "load up" with drugs before being sent to CCCC. Several CHS reported persons intentionally violating the terms of their supervised release so they could go to CCCC and make money selling drugs. One CCCC inmate reported making $10,000 inside CCCC in less than a month from selling methamphetamine. Other inmates have reported leaving CCCC with more than $50,000 in their CashApp accounts from drug sales.

183.    Within the last two weeks, agents learned that former CCCC inmate MONIQUE GALLEGOS is attempting to introduce drugs into the facility with the help of her boyfriend, DAVID HICKS. GALLEGOS is on state probation for a charge of receiving stolen property, Case No. D-1333-CR-2023-00012.

184.    Investigators subsequently analyzed recorded jail phone call records and discovered that HICKS has been utilizing the phone number 505-240-9249 to communicate with current inmates. Since GALLEGOS release, on August 23, 2024, HICKS received multiple calls from CCCC inmates MELISSA KRUKOFF, CASSANDRA ORNALAS, ANGEL GARNER, and DIAMOND ARAGON.

185.    In late August 2024, HICKS received a call from CCCC inmate GARNER. GARNER asked HICKS if she could speak to former USMS inmate GALLEGOS. HICKS stated that GALLEGOS would "be back soon." HICKS was referring to GALLEGOS being back in custody at CCCC. GARNER stated that she "has high hopes and hopes to get high" when GALLEGOS comes back to the facility. HICKS responded, "he wasn't going to give her anything to take in," and "she better find someone."

186.    In prior phone conversations, which were captured on recorded CCCC lines, GALLEGOS

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

used HICKS to move money to her through CashApp. The money was then sent to other inmates to pay off GALLEGO's debts and for her to buy narcotics.

187.    Agents located a recorded jail message, from August 2023, wherein GALLEGOS wrote to HICKS, "The cash app is $happyjoy6p send the 50 there."

188.    In May 2024, MONTELONGO also had drug trafficking conversations with Target Subject SONIA TRINIDAD.

189.    Agents also found recorded phone conversations between GALLEGOS and inmate ARIS BROWN. On May 28, 2024, GALLEGOS talked about trying to corrupt a CO to bring narcotics into CCCC. GALLEGOS stated that she was "fishing"[23] to see if the CO can "help her out." GALLEGOS also stated that "she doesn't like to get in trouble, it just happens" and that she won't get in trouble "it just depends on if it's a rookie CO or not." During the conversation, BROWN expressed that he wanted GALLEGOS to be careful.

190.    During a second conversation on May 28, 2024, GALLEGOS alluded to being a courier of narcotics to and from court. GALLEGOS asked why BROWN never showed up to court. BROWN explained that he was "dope sick" and didn't make it. GALLEGOS then stated that "you need to come see me on Tuesday, you'll be good for a long time." In my training and experience I understand that to mean that GALLEGOS would give BROWN drugs to make him feel better.

191.    Agents believe that GALLEGOS and HICKS are currently living together at HICKS's residence, Subject Premises A-13.

192.    On August 20, 2024, GALLEGOS received a tablet message from HICKS saying, "I'm glad your going to come home to live with me."

193.    HICKS is no stranger to local law enforcement. The Grants Police Department ("GPD")

---

[23] Fishing is a term used by inmates to attempt to solicit CO's into bringing in drugs for them.

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

advised agents that HICKS is the target of several current narcotics investigations. Narcotics detectives with the GPD have independently identified Subject Premises A-13 to be a drug trafficking house.

194.    Multiple CHS reported two men at the Diersen halfway house in Albuquerque were coordinating drug loads going into CCCC from Diersen. The sources identified JOHNNY VALITERRA, aka: "CHOPPER," and RICHARD PORRAS, aka: "DEUCE," both validated WSL gang members, as the arrangers of body-carry drug shipments into CCCC. CoreCivic Intel Unit officers have located CashApp account information for both VALITERRA and PORRAS during searches of jail cells at CCCC. PORRAS recently returned to Diersen from CCCC.

195.    On September 26, 2024, I and other members of the investigative team were notified BOP offender HENRY DEVIN would be transferred from the Diersen halfway house in Albuquerque to the CCCC for disobeying rules at the halfway house. The investigative team suspected DEVIN might attempt to bring narcotics into CCCC and conferred with CCCC staff.

196.    The next day, DEVIN arrived at CCCC and underwent body scanning as part of the intake process. Shortly thereafter, CCCC Intel Unit officers reviewed the body scan images and noticed potential contraband inside DEVIN's rectum. CCCC officers removed DEVIN from his cell and re-scanned his person. Other officers searched DEVIN's jail cell. During the second body scan, officers observed an anomaly in DEVIN's rectum which they believed to be contraband. Officers then conducted a strip search of DEVIN and recovered the following items:

    a)  One hypodermic syringe

    b)  7 strips of suboxone

    c)  >one gram of marijuana

    d)  Officers subsequently recovered >one gram of methamphetamine when it naturally

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

passed from within DEVIN's rectum.

197.    DEVIN was in possession of a note that had the CashApp account number for VALITERRA.

198.    Within the last six weeks, CHS-39 reported PORRAS came into CCCC a few weeks ago loaded with enough suboxone to sell over a 30-day period. During that time PORRAS sold suboxone and had his drug clients send payment to VALITERRA's CashApp account.

199.    CHS-42 reported that inmates in the halfway house would obtain drugs and then smuggle them, body pack, into CCCC.

200.    CHS-12 reported that VALITERRA was caught with 700 fentanyl pills in early 2023. CHS-12 reported that following the seizure of 700 fentanyl pills from CHOPPER, a CO was fired for smuggling drugs into CCCC. CHS-12 believed the CO had brought the 700 fentanyl pills in for CHOPPER.

201.    CHS-12 reported that inmates often hid drugs in their rectum.

202.    CHS-13 reported that an inmate was released for one day, on furlough, and returned with one ounce of methamphetamine which was not discovered upon the inmates return.

203.    CHS-13 and CHS-26 reported that they knew inmates would also obtain drugs when they went to court and smuggle them back to CCCC.

204.    CHS-11, 20, 22, 26, 23, and 32 reported that inmates were currently getting dope from defendants who turn themselves in, who would body pack.

205.    CHS-42 reported that they had observed a boat of fentanyl pills inside CCCC. Usually there is a delivery of dope into the facility every week.

206.    CHS-2, 4, 5, 8, 11, 12, 13, 14, 17, 18, 22, 23, 24, 27, 28, 29, 30, 32, 40 and 42 reported that inmates often had people on the outside moving drugs and money or helping those inmates obtain

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

drugs while inside the facility.

207.    CHS-5, 8, 10, 12, 17, 18, 19, 20, 23, 29, 39, and 42 reported inmates use CashApp to pay for drugs and the CashApp accounts are maintained by the inmate's family or friends.

208.    CHS-5, 8, 9, 10, 11, 12, 13, 14, 18, 19, 20, 22, 23, 24, 25, 29, 32, 40, 41 and 42 reported that there were dirty COs at CCCC, who would smuggle drugs and other contraband in for inmates.

209.    CHS-5, 10, 13, 14, 23, and 39 reported that they knew of inmates with a cell phone, a smart phone, and believed that the inmate checked their CashApp via the contraband cell phone.

210.    CHS-3, 10, 12, and 14 reported that inmates with jobs could more easily get cell phones and deal drugs.

## 5 Drug Overdoses Inside CCCC

211.    SONIA TRINIDAD has had regular contact with at least twelve CCCC inmates in recent months. TRINIDAD is currently serving a term of supervised release after being convicted of accessory after the fact relating to a bank robbery, the case was investigated by the FBI, Case No. 1:22-cr-01508-WJ.

212.    On September 16, 2024, TRINIDAD missed her regular scheduled drug test.

213.    I reviewed recorded messages with USMS inmate CYNTHIA MONTELONGO and TRINIDAD, from May 2024. A brief synopsis of the messages are below:

MONTELONGO: "Hey so what happened?? I know someone called u to pickup the baby tonight, did that happen I need to k now if u still have room for another carseat if so let me know so u can pick up my other kid he's ready too."

TRINIDAD: "Nope swears it was there I told her nope will have Kristina come dbl count later I'm going out right now.ugh I'll just put more outfits out."

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

MONTELONGO: "Fuck man OK well I'm sending u the cash for the ones I told u no later than tomorrow. IMA type a message in Spanish to y homie. Will u pease copy it and send it to him let me just get the info from ale so u can add him, n I'll call u sreal fast to give u the info please ale cant add phone time on h…Will u try n send Angelo a message n ask him if he was able to get anything together for the camping trip.."

TRINIDAD: "OK cool yeah I have a heart for her but I need her friend to come for it or I'm sending it with my friend to her friends…" The rest of the message is in Spanish and roughly translates as follows: "I have several hearts for your girlfriends, also if you can find more diapers that will be good. I will call your daughter at 2 and then at 4 again."

214.    TRINIDAD to JESUS ROMERO RODRIGUEZ, the message was in Spanish. A brief translation of the message follows: "…I have a box of diapers that I bought for the Baby for 200. And I think 15 kisses….give another heart to my carnal…Whatever you can…"

215.    TRINIDAD to MONTELONGO, briefly, the messages follow:

TRINIDAD: "No one called yesterday…I need to finish wrapping more presents for his party."

TRINIDAD: "…santina screwed me on 32 outfits I had to sell at the flea market for the fund raiser…"

MONTELONGO: "Hey request that rent money that I owe u to this cash app $Steveof the name is Steve Fernandez and phone number is 505-448-6071. Its that guy that texed u all rude. But he knows ur gonna request it k.."

216.    MONTELONGO sent the following message, in Spanish, to TRINIDAD. TRINIDAD then sent the Spanish message to ROMERO-RODRIGUEZ. A brief and rough translation follows: "…She is my friend who worked with me.. Look I have 200 diapers and 15 kisses. Ready, to give

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

them to your comadre. I wanted to know if you would give me the chance to add some arramcon too??? Just tell me what day Ale has to take his little brother to your comadre and where. I need to talk to you but you never talk damn. Call for sure at 7…I'm getting more diapers. Today I grabbed 4 hearts."

ROMERO-RODRIGUEZ responded, in Spanish, to TRINIDAD. A rough translation follows: "OK there is Marco again at 8 and 9pm and there I have more hearts ready tell him to come early or my friend is going to see his friend."

MONTELONGO to TRINIDAD: "That $ can u put 80 on Jaimie's books but it has to be tonight so she's able to order coissary [commissary] this weekend the name is Jamie Moreno commissary # 5622039. Please"

217.    On May 29, 2024, at approximately 10:18 pm ASHLEY KEDING sent the following message, in Spanish, to MONTELONGO. A brief and rough translation follows: "OK, cool, if there is more, I'll send you where LA mermacha rules. I know that these guys came out with 6 and that was all there was. I'll send you like the Ultima's hearts, already pure. Good and enough hearts. I can send you for $80 if you have them. More diapers for Friday that they deliver to your daughter the clothes and a bottle of water for the milk and she delivers the child with all his things About 6 or 7 pm time I mark 645 and then at 730 and 8pm those hours".

218.    On May 29, 2024, a phone call from women's housing at CCCC, from USMS inmate TRUJILLO at approximately 9:50 pm. TRUJILLO spoke about being sick, burning up, and throwing up. She also talked about the drug overdoses, saying that five (5) people overdosed, explaining that the drugs are pure, like dust. TRUJILLO commented that the shits no joke. She said that she did it again and didn't want to be sober and that everyone that did it is falling out, saying that she was still standing but was hot, burning up and sick. She said that it was expensive

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

at 200 to 300 a cap, she did quite a bit, and everyone was keeping an eye out for her."

219.    Also, on May 29, 2024, MONTELONGO sent a message to TRINIDAD. Briefly, the message is as follows: "…I still have talked to homie to see when his girl is gonna pick up the bby he told me tomorrow. IMA try n get ahold of him now if not early in the morning k.n I'm glad ur happy with my new primo…"

220.    Also, on May 29, 2004, USMS inmate DELILAH FERNANDEZ made a call to her mother saying that a girl in the pod almost died, she was all purple. FERNANDEZ claimed she had to do CPR because no one else knew what to do.

221.    On May 30, 2024, TRINIDAD sent a message to MONTELOGO, briefly the message follows: "….Jessica's daughter died they found her in bed dead yesterday…"

222.    In other messages and calls, MONTELONGO regularly uses the terms baby, diapers, and kisses. In my training and experience, MONTELONGO is using the terms baby, diapers, and kisses to refer to drugs.

223.    The number that TRINIDAD has used to communicate with inmates at CCCC is the same number she has given to US Probation.

224.    CCCC confirmed that on May 29, 2024, two inmates and three COs were treated for overdose, the five individuals were transported to the hospital for treatment. The overdoses appear to be due to the pure hearts that MONTELONGO, KEDING, and TRINIDAD talk about.

225.    Within the last six weeks, CHS-21 reported that TRINIDAD sells fentanyl, and lives at Subject Premises A-8.

226.    CHS-42 reported that they had observed a boat of fentanyl pills inside CCCC. Usually there is a delivery of dope into the facility every week.

227.    CHS-2, 4, 5, 8, 11, 12, 13, 14, 17, 18, 22, 23, 24, 27, 28, 29, 30, 32, 40 and 42 reported that

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

inmates often had people on the outside moving drugs and money or helping those inmates obtain drugs while inside the facility.

228.    CHS-5, 8, 10, 12, 17, 18, 19, 20, 23, 24, 29, 39, and 42 reported inmates use CashApp to pay for drugs and the CashApp accounts are maintained by the inmate's family or friends.

229.    CHS-5, 8, 9, 10, 11, 12, 13, 14, 18, 19, 20, 22, 23, 24, 25, 29, 32, 40, 41 and 42 reported that there were dirty COs at CCCC, who would smuggle drugs and other contraband in for inmates.

230.    CHS-5, 10, 13, 14, 23, and 39 reported that they knew of inmates with a cell phone, a smart phone, and believed that the inmate checked their CashApp via the contraband cell phone.

231.    CHS-3, 10, 12, and 14 reported that inmates with jobs could more easily get cell phones and deal drugs.

## Drugs Introduced to CCCC via Hospital Visits

232.    In late September, agents learned that USMS inmate JOSEPH BALDONADO, aka: "HAPPY," was a significant drug trafficker at CCCC. Agents reviewed jail messages going back to June 2024, and learned that BALDONADO has had his girlfriend, DESIREE BENAVIDEZ, assist him in his drug trafficking by managing and laundering the drug proceeds. They regularly talk over the facility messaging. A significant portion of their conversations are about people paying for drugs via CashApp and Apple Pay. The last conversation that I reviewed was on September 24, 2024. I have included just a few of the many drug and money conversations below.

233.    A summary of a June conversation follows:

USMS BALDONADO: "Did you just get a c note"

BENAVIDEZ: "Ya why u r u handing out my number u really love me na if ur going to ask don't tell them to call for u"

USMS BALDONADO: "I didn't have no one call he was trying to send what he owes and

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

all together it should be a total of $300 that got sent two different fools"

BENAVIDEZ: "Just a c note"

USMS BALDONADO: "Love tell him I'm trying to to night when she goes to clean the hotel rooms like your brother went to visit ."

BENAVIDEZ: "200 for Leo. He said tonight"

USMS BALDONADO: "OK thank u love u. Its isaac1717?"

BENAVIDEZ: "$IsaacB1717"

USMS BALDONADO: "…so Leo was the last one ."

BENAVIDEZ: "No, there was seven and 125 for G"

USMS BALDONADO: "Dolores or the other"

BENAVIDEZ: "Idk it says for Gucci"

234.     The following messages are from September:

USMS BALDONADO: "Was their any thing today? And two days their should have been a c note."

BENAVIDEZ: "There was 100 now."

USMS BALDONADO: "Are you sure their should be a c note."

BENAVIDEZ: "50 yesterday from AJ."

USMS BALDONADO: "What's the name ?or numbers ? On the 50 and no I'm not calling again ."

BENAVIDEZ: "100 from mosca and 50 from aj."

235.     And a day later, BENAVIDEZ sent BALDONADO the following messages.

BENAVIDEZ: "60 for primo"

BENAVIDEZ: "20 for c"

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

BENAVIDEZ: "200 from star"

236.    About a week later, in September 2024, they had the following conversation:

USMS BALDONADO: "U never said who that 350 was for or for who it was from."

BENAVIDEZ: "I told you there was no name on it. The 100 was for 76 an the 250 was from Roslyn."

USMS BALDONADO: "And was their anymore for the same person who gave the 250 said they sent five altogether ?the Roslyn so is it so .plz get back to me so what's the sender ??"

BENAVIDEZ: "The only thing was the 350."

237.    BALDONADO also gets dialysis on a weekly basis. According to several CHS BALDONADO obtains his drugs while he is at the dialysis facility. The dialysis facility is an open facility with little to no security. Meaning, someone could walk in off the street and access the facility, place a package containing drugs in a conspicuous location, and BALDONADO could pick up the package during his medical visit.

238.    On September 13, 2024, CCCC Investigators searched BALDONADO's cell and located the following:

    a)  1 gram of heroin,

    b)  35 suboxone strips,

    c)  3 grams of wax, and

    d)  2 grams of methamphetamine.

239.    On September 13, 2024, BENAVIDEZ sent BALDONADO a message asking why he did not go to dialysis.

240.    CHS-2 reported BALDONADO regularly received drugs inside CCCC and remains one of

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

the more consistent dealers inside the jail. CHS-2 reported BALDONADO was caught with drugs in September 2024 and placed in the CCCC secure housing unit yet was still able to distribute suboxone to other inmates. CHS-2 reported BALDONADO was currently selling Suboxone and heroin inside CCCC.

241.    CHS-3 reported BALDONADO always had methamphetamine, Suboxone, and heroin to sell to other inmates. CHS-3 said BALDONADO was transported from CCCC to a kidney dialysis appointments two-three times per week and almost always came back with a new stash of drugs.

242.    CHS-10 reported that USMS inmate LEO worked in commissary, had a cell phone, and moved drugs through the commissary.

243.    CHS-10 reported that when a CCCC inmate purchased drugs they would pay for those drugs via several methods. CHS-10 stated that an inmate could pay by putting money on another inmates books, have someone outside the facility put money on the other inmates books, or have someone on the outside pay via CashApp.

244.    CHS-12 reported that a CO who worked in commissary smuggled four (4) ounces of methamphetamine into CCCC.

245.    CHS-12 reported that inmates often utilized girlfriends on the outside to send/receive payment for drugs via CashApp.

246.    CHS-17 reported that inmates utilized CashApp to send/receive payment for drugs.

247.    CHS-5 and CHS-6 reported that inmates with medical visits, outside CCCC, could obtain drugs while at the medical facility and smuggle them into CCCC.

248.    CHS-14 reported that inmates utilized the commissary to bring drugs into and move them around CCCC. The inmates would hide the drugs in various items, such as chip bags and shoes.

249.    CHS-40 reported that JOSEPH BALDONADO, aka: "HAPPY," obtained drugs at dialysis

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

and smuggled them into CCCC.

250.    CHS-2, 4, 5, 8, 11, 12, 13, 14, 17, 18, 22, 23, 24, 27, 28, 29, 30, 32, 40 and 42 reported that inmates often had people on the outside moving drugs and money or helping those inmates obtain drugs while inside the facility.

251.    CHS-5, 8, 10, 12, 17, 18, 19, 20, 23, 29, 39, and 42 reported inmates use CashApp to pay for drugs and the CashApp accounts are maintained by the inmate's family or friends.

252.    CHS-5, 8, 9, 10, 11, 12, 13, 14, 18, 19, 20, 22, 23, 24, 25, 29, 32, 40, 41 and 42 reported that there were dirty COs at CCCC, who would smuggle drugs and other contraband in for inmates.

253.    CHS-5, 10, 13, 14, 23, and 39 reported that they knew of inmates with a cell phone, a smart phone, and believed that the inmate checked their CashApp via the contraband cell phone.

254.    CHS-42 reported that they had observed a boat of fentanyl pills inside CCCC. Usually there is a delivery of dope into the facility every week.

255.    CHS-3, 10, 12, and 14 reported that inmates with jobs could more easily get cell phones and deal drugs.

### The Corrections Officers

#### Ana Romero

256.    ANA ROMERO was hired by CCCC as a CO in late October 2023. Within a few months of starting her job, ANA ROMOERO was deeply rooted in personal romantic relationships with at least two USMS inmates and aiding in drug trafficking and money laundering for several others.

257.    Throughout the month of February 2024, ROMERO had numerous unauthorized telephone conversations with at least four USMS inmates being housed at CCCC. During those conversations ROMERO and federal detainees discussed drug transactions and ROMERO sent money to subjects on the street via PayPal and CashApp. A short rendering of one such call follows:

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

258.    USMS inmate FERMIN AGUILERA: "I will send $1,000 to your (ROMERO) CashApp."

259.    ROMERO interrupted AGUILERA and said, "We don't talk about that on the line (recorded jail call)."

260.    Shortly thereafter ROMERO asked AGUILERA, "On the real, what's the money for?"

261.    AGUILERA responded, "For the five stamps you're supposed to be sending me." AGUILERA went on to talk about ROMERO mailing him stamps the next time she was in the office.[24]

262.    ROMERO bragged that she had the most points to use when she purchased marijuana because she was their number one customer. ROMERO described the containers the pre-rolled marijuana came in and AGUILERA told her to bring him "five of those" and to "stick it where I'm going to fuck it."

263.    By late February 2024, communications recorded by CoreCivic indicated ROMERO was romantically involved with AGUILERA and USMS inmate JUSTIN BRASHER, aiding them, and others, in distributing drugs within CCCC. ROMERO subsequently obtained a second cellular telephone to be utilized when she spoke with BRASHER.

264.    Throughout March and April 2024, ROMERO continued to communicate with AGUILERA and BRASHER regarding her efforts to smuggle drugs into CCCC and move drug proceeds via CashApp, at the direction of the federal inmates.

265.    On May 3, 2024, ROMERO, using alias "Amy Montoya," emailed BRASHER and said, "Baby I was released today so now we can FaceTime."

266.    On May 3, 2024, ROMERO and AGUILERA spoke on the telephone and ROMERO

---

[24] Based on my training and experience, I am aware the term "stamps" is a reference to synthetic marijuana, which is also known as Spice or K2. Synthetic marijuana is lab-made designer drug that mimics the THC found in marijuana.

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

informed AGUILERA that she was terminated for violating policy and must pick up her final paycheck on Wednesday.

267.    On May 3, 2024, ROMERO was in fact terminated by CoreCivic. ROMEROs' termination from CoreCivic did not dissuade her relationships or communications with federal inmates. In fact, by mid-May 2024, ROMERO was engaging in drug trafficking and money laundering with a third federal inmate, JESUS ROMERO-RODRIGUEZ.

268.    During the months of May, June, and July 2024, ROMERO continued to conspire to traffic in controlled substances, launder drug proceeds, and introduce contraband on behalf of AGUILERA, BRASHER, ROMERO-RODRIGUEZ, and others to the CCCC facility.

269.    On July 10, 2024, ROMERO and AGUILERA discussed the fact that ROMERO sent a CCCC employee into "the pod next door" to recover ROMERO's CashApp address to prevent someone from getting into trouble. The two went on to discuss other CCCC employees to include Target Subject and CO KIMBERLY PERRY. ROMERO became upset with AGUILERA and accused him of using "clear" (street term for methamphetamine). ROMERO also expressed anger, likely out of jealousy, at AGUILERA because he was concerned CO KIMBERLY PERRY was going to get fired. I have outlined KIMBERLY and KELLY PERRY's participation in the CCCC drug trafficking epidemic below.

270.    During the months of July, August, and September 2024, ROMERO continued her nefarious communications with AGUILERA, BRASHER, ROMERO-RODRIGUEZ, and others.

271.    To date, CoreCivic Intel Unit investigators have discovered ROMERO has utilized at least twenty-five cellular telephone numbers to communicate with federal inmates at CCCC. Similarly, ROMERO has established seventeen alias names and seventeen different email addresses to message with federal inmates at CCCC.

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

272.    I am aware ROMERO is currently in the hiring process as a CO with the Arizona Department of Corrections ("AZDOC"). I have spoken with CoreCivic Intel Unit members and have verified they are speaking with AZDOC background investigators to safeguard ROMERO from being hired as a CO.

273.    On October 3, 2024, CoreCivic Intel Unit investigators monitored ROMERO in an online video visit with AGUILARA. During the video visit, investigators were able to identify her location, as being at location A-10.

274.    CHS-5 reported that inmates DERICK SIMS, aka: "HD," and LUIS MONTOYA, aka: "DEMON," paid a CO to bring in drugs.

275.    CHS-25 and CHS-41 reported that ROMERO smuggled drugs into CCCC.

276.    CHS-5 reported that the CO who SIMS and MONTOYA paid was ROMERO, who brought sunglasses, USB drives, and drugs into the facility. CHS-5 observed SIMS with methamphetamine, suboxone, and wax.

277.    CHS-5 knew that ROMERO lived in Gallup, NM.

278.    CHS-5 believed that inmates paid ROMERO $5,000 per drop, or importation of drugs into CCCC.

279.    CHS-5 reported that one way inmates recruit COs is by finding ones that accept notes, and further explained that if the CO accepted a note that meant that they were friendly and likely willing to introduce contraband into the facility.

280.    CHS-5 reported that an inmate would need someone on the outside to get the drug to the CO. The person on the outside would put the drugs together, for the inmate, and then meet with the CO to hand off the drugs. The inmates then use CashApp to accept payment for the drugs.

281.    CHS-9 reported that they had watched a CCCC staff member place a package on a food

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

tray, destined for a pod of inmates. CHS-9 also reported that CCCC staff members were introducing drugs into the facility for inmates.

282.    CHS-10 reported that drugs were often transported around the facility on the food trays. CHS-10 reported that the kitchen staff often imported drugs into CCCC.

283.    CHS-12 reported that SIMS had bought four (4) ounces of methamphetamine from another inmate, which was smuggled into the facility by a CO. SIMS paid $20,000 for the four ounces of methamphetamine. SIMS had his girlfriend take $10,000 cash to the other inmates girlfriend, and $2,000 was deposited into CashApp.

284.    CHS-18 reported that inmates utilized COs to smuggle drugs into CCCC. One CO concealed suboxone and methamphetamine in his boots to get past security and later drops the drugs in a cell while conducting a search of the cell. CHS-18 knew that the CCTV surveillance cameras did not reach into the cells, so the CO could unload and deliver the drugs while conducting the search without being captured on surveillance cameras.

285.    CHS-18 reported that inmates selling and purchasing drugs utilized people on the outside to send and collect money via CashApp. CHS-18 explained that CashApp would flag accounts when they reached a certain amount, therefore family members on the outside were constantly making new CashApp accounts.

286.    CHS-18 also reported that sometimes the family members on the outside did not use CashApp. Specifically, in one case CHS-18 knew of an inmate who was receiving upwards of $10,000 per transaction and, due to the high amount, would have family members conduct the transactions in cash.

287.    CHS-18 reported that inmates would also use voice and text services provided by CCCC to coordinate drug and money transactions.

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

288.    CHS-19 inmates use CashApp to pay for drugs and the CashApp accounts are maintained by the inmate's family or friends. Several COs at CCCC are dirty and bring drugs into the jail.

289.    CHS-2, 4, 5, 8, 11, 12, 13, 14, 17, 18, 22, 23, 24, 27, 28, 29, 30, 32, 40 and 42 reported that inmates often had people on the outside moving drugs and money or helping those inmates obtain drugs while inside the facility.

290.    CHS-5, 8, 10, 12, 17, 18, 19, 20, 23, 29, 39, and 42 reported inmates use CashApp to pay for drugs and the CashApp accounts are maintained by the inmate's family or friends.

291.    CHS-5, 8, 9, 10, 11, 12, 13, 14, 18, 19, 20, 22, 23, 24, 25, 29, 32, 40, 41 and 42 reported that there were dirty COs at CCCC, who would smuggle drugs and other contraband in for inmates.

292.    CHS-5, 10, 13, 14, 23, and 39 reported that they knew of inmates with a cell phone, a smart phone, and believed that the inmate checked their CashApp via the contraband cell phone.

293.    CHS-3, 10, 12, and 14 reported that inmates with jobs could more easily get cell phones and deal drugs.

294.    CHS-42 reported that they believed female COs were bringing the dope into the facility.

<u>Adolfo Montano: Drug Cover up, Inmate Escape and CO Attack</u>

295.    ADOLFO MONTANO was a CO at the facility who had obtained the rank of Captain. Several features of his time at CCCC were unusual.

296.    MONTANO hired his own inmate porters without consulting CoreCivic's security team on the porters' background.  These porters included MARQUAE KIRKENDOLL, an inmate whose involvement in drug trafficking in described in greater detail below.  They also included LUIS MARISCAL-LOPEZ, whose involvement in a violent escape attempt is described in greater detail below. I know, based on my training and experience, that a porter can be particularly useful for inmates who want to move drugs within CCCC.  Porters transport items between cells, which

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

can allow them to move drugs and other contraband easily.

297.    Several CHS have reported that COs, MONTANO included, made money importing drugs to the facility.

298.    In early May 2024, a CCCC CO (hereinafter "CO 1") smelled smoke/burning coming from one of the cells. CO-1 told the inmates to stop smoking, but they continued. CO-1 radioed for backup so they could search the cell and notified the shift supervisor, MONTANO. However, MONTANO ordered CO-1 to stand down and denied the request for backup and to search the cell.

299.    CO 1 refused to let the smoking inmates go unchecked. Against MONTANO's order, CO-1 discretely called another CO (hereinafter "CO-2," and collectively CO-1 and CO-2 will be referred to hereinafter as "COs"), and the two searched the cell.

300.    Inside the cell, the COs located packets (later found to contain methamphetamine) and inmates which appeared to be high. Shortly after beginning the search, MONTANO radioed the COs, told them to stop searching and to put the inmates back in the cell. The COs collected and secured the packets for field testing. MONTANO told the COs not to test the contents of the packets. The COs subsequently did test the packets and received positive field test results for methamphetamine. The COs took photographs and a video of the narcotics and the positive field tests, with a department issued camera to document their findings. CO-1 later wrote and submitted a report.

301.    Following the above incident, CO-1 checked on the status of their report, the photographs and drug evidence. They learned that the drugs were not in evidence, the photographs were deleted from the camera, and the report was missing. The officer believed that MONTANO removed the drugs from evidence, deleted the photographs, and destroyed the report in an effort to cover up the entire incident.  CO-1 reported that the digital camera that would have contained the photographs

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

and video was typically stored in the shift supervisor's office. MONTANO was the shift supervisor. Agents later confirmed that no report on this incident existed.

302.    Following the above, CO-1 noticed that MONTANO would call them over the radio, throughout the shift and every time MONTANO was their shift supervisor, and make comments unrelated to work, such as fix your boots or fix your shirt collar. This made the officer feel as though MONTANO was always watching them. The officer had not previously experienced this behavior by MONTANO.

303.    On May 27, 2024, inmates DAKOTA BRISCOE, aka: "OUTLAW," (a prominent NUEVO and validated WSL gang member) and LUIS MARISCAL-LOPEZ, escaped from their cell and assaulted CO-1.

304.    CHS-4 reported to agents that BRISCOE was running a large portion of the drug trade on a secret cell phone, and there was reported to be $50,000 in a CashApp on the phone.

305.    The inmates escaped from their cell by tricking CO-1 into approaching the door. CO-1 was attempting to help BRISCOE with obtaining legal paperwork from another cell. When CO-1 approached their cell, the inmates opened the door and attacked the officer. BRISCOE was armed with a shank and MARISCAL-LOPEZ was armed with an improvised flail, described as a cloth bag containing a weighted object secured in the bottom of the bag which created a weighted head made to swing, a bludgeoning weapon.

306.    BRISCOE and MARISCAL-LOPEZ had fixed the cell door so as to not latch and when CO-1 was attempting to help them, they opened the door and grabbed CO-1. MARISCAL-LOPEZ wrapped his arm around CO-1's neck, from behind the officer, and then wrapped the improvised flail around the officer's neck and tightened it, while BRISCOE threatened the officer with the shank. All the while, the two inmates were grabbing at the officer's belt for the keys and radio.

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

307.    BRISCOE and MARISCAL-LOPEZ threatened to kill CO-1 if they radioed for help. MARISCAL-LOPEZ asked CO-1 if it was worth their life, and managed to take the keys which were secured to the officer's belt. They took the keys and pulled CO-1 deep into the cell, the officer blacked out, likely from being strangled. When CO- 1 woke up, they managed to lock the cell door and radio for help. CO-1 still had their radio because the inmates were unsuccessful in stealing it because they had it in their pocket, not on their belt.

308.    The rescue team secured BRISCOE and MARISCAL-LOPEZ, locating the improvised flail but not the shank. They also located CO-1 still locked in the cell. The officer suffered minor injuries to their neck, consistent with their recollection of events. Two weeks after the incident, CO-1 was only working in a limited capacity because they were severely traumatized and feared returning to full time work.

309.    CO-1 later recounted a few things that seemed strange, which made them fell as though they were set up, based on the following:

   a)    MONTANO assigned CO-1 to the high security section of the facility, the Separate Housing Unit or "SHU," where the high risk inmates BRISCOE and MARISCAL-LOPEZ were housed. CO-1 did not have the required experience or rank to monitor the SHU, plus there should have been two guards assigned to the SHU for the shift, all violating the normal procedures.

   b)    The door to the cell where BRISCOE and MARISCAL-LOPEZ escaped, later immobilizing and hiding CO-1, was unlocked all night. There would have been an alert that the door was open, however no one ever alerted the guard.

   c)    The camera that CO-1 utilized to photograph the drug evidence was usually stored in the shift supervisor's office.

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

310.    By way of background, in September 2020, BRISCOE was arrested and later convicted in federal court with multiple counts of carjacking and using a firearm during a crime of violence. The charges stem from incidents ranging from August to September 2022, wherein BRISCOE killed two subjects, torched their car, then terrorized an Albuquerque neighborhood in an attempt to steal a car and get away.[25] The FBI led the federal investigation against BRISCOE, who was convicted on all counts on December 8, 2023, Case No. 1:20-cr-01777-MV.

311.    When BRISCOE was arrested, apparently fleeing prosecution, he was in southern New Mexico near the New Mexico-Mexican border. At the time BRISCOE was arrested, he had new face tattoos, in an apparent attempt to conceal his identity. He attempted to evade arrest by providing arresting officers with a different name.

312.    MONTANO also had several disciplinary reports in his file, such as leaving a pod without a CO, not completing regular checks of equipment logs, and for being the shift supervisor when two inmates escaped (outlined below). MONTANO was subsequently terminated from the facility.

313.    It has been reported, by CHS, that MONTANO recently acquired a truck—either with drug proceeds, or as a form of payment from inmates involved in drug trafficking.  Multiple CHS have reported that a way for inmates to pay for drugs is not with money but with a vehicle. In this case, multiple CHS have explained that each package a CO delivers, the inmates may pay the CO anywhere from $3,000 to $6,000. Multiple CHS have reported that some COs bring in packages for several inmates per week. A CO who imports several packages a week, every week, would make a considerable amount of money. For example, a CO who brings in three packages a week, at $6,000 each, could make $18,000 ($6,000x3). If that same CO brings in three packages a week for a month, they could make $72,000 ($18,000x4). Over a year, a CO who brings in three

---

[25] https://www.krqe.com/news/crime/man-accused-of-killing-2-friends-burning-their-bodies-arrested/

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

packages a week, every week, could make over $900,000 ($72,000x52).

314.    In my training and experience, and one possible motivation for the described behavior outlined herein, I know that COs make considerably less than $72,000 per month. In fact, according to the CoreCivic website, a CCCC CO starts at less than $48,000 per year, before taxes.[26] So, a CO who imports three packages a week, every week, could make twice as much in a month as they make a year.

315.    Over my career, many CHS have explained that sometimes drug debts are paid for not with cash but with a vehicle. In fact, as described in this affidavit, when the FBI arrested JESSE YOUNG he had a vehicle which was registered to THERESA ATENCIO. YOUNG told agents that the vehicle was given to him to pay off a drug debt. Just a few months ago, I was the case agent for the trial of Erminio Gonzalez, who was charged with drug trafficking, firearms violations, and conspiracy. During the trial, testimony was provided by a cooperating witness who advised they had given an RV to someone as partial payment for a drug debt. Gonzalez was subsequently convicted.

316.    CHS-32 reported that MONTANO was going through a rough divorce, which typically results in financial strains.  CHS-32 is also aware that MONTANO has at least two children and was taking care of the children by himself.

317.    CHS-32 believed that, given MONTANO's divorce and parenting expenses, the new RAM truck he had recently purchased was likely too expensive for him to afford on his own.

318.    In my training and experience I have been a part of searches where drug ledgers have been located that were over a year old. Therefore, I believe there is probable cause to believe that a search of Subject Premises A-11 may yield evidence of MONTANO's illicit financial benefit

---

[26] https://jobs.corecivic.com/us/en/job/req26145/Detention-Officer

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

gained from drug smuggling into CCCC, including the RAM truck observed in his driveway.

319.    CHS-4, 25, 32, and CHS-41 reported that MONTANO smuggled drugs into CCCC.

320.    During surveillance operations, agents observed a new RAM truck parked in the driveway of MONTANOS residence, Subject Premises A-11.

321.    CHS-4 and CHS-32 reported that inmates paid MONTANO to import drugs into CCCC with a vehicle, not money.

322.    CHS-20 reported that inmates had paid a CO to import drugs into CCCC with a vehicle, not money.

323.    CHS-13 reported that a CO offered them a burner phone, however the CHS declined.

324.    CHS-13 reported that ranking staff at CCCC were dirty and was present when one ranking staff member attempted to bribe the inmates so they would not talk to the USMS.

325.    CHS-13 reported that drugs were prevalent in CCCC, it was a crazy place, and most of the inmates use drugs inside. The inmates were on the phone all day long talking about CashApp.

326.    CHS-13 reported that the inmates would disassemble the light switch to make a spark, burn toast, and use the heat generated from the burning toast to smoke drugs. The COs do nothing about the inmates smoking drugs.

327.    CHS-18 reported that CO DENNIS GARCIA was in property and smuggled drugs into the facility. DENNIS GARCIA was subsequently fired and arrested after he attempted to smuggle 139.7 grams of methamphetamine into CCCC.

328.    CHS-14 reported that in 2022 the Paisas had a gun and the 505 car was trying to get a gun inside CCCC.

329.    CHS-14 reported that COs would smuggle drugs into CCCC for the inmates. CHS-14 was aware of a drop from a COs that included a pound of methamphetamine, a quarter pound of heroin,

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

and five (5) cell phones.

330.    CHS-14 reported that a shot-caller for the Paisas would pay the COs up to $10,000 for dropping of a load of drugs and cell phones.

331.    CHS-14 reported that the inmates would pay the COs in cash and communicated with the COs via contraband cell phones inside the facility.

332.    CHS-14 reported that the COs often alerted the inmates of any searches or raids to be conducted on the inmates and their cells.

333.    CHS-14 suspected that there was a Captain involved in the CCCC drug epidemic.

334.    CHS-14 reported that CCCC was run by the inmates, because the inmates were able to be moved around easily and could pretty much do whatever they wanted.

335.    CHS-19 inmates use CashApp to pay for drugs and the CashApp accounts are maintained by the inmate's family or friends. Several COs at CCCC are dirty and bring drugs into the jail.

336.    CHS-23 and 43 reported that ADOLFO MONTANO smuggled drugs into CCCC and he was fired for it.

337.    CHS-4 reported that MONTANO was facilitating drug trafficking within CCCC. Specifically, MONTANO would bring the drugs into the facility himself and MONTANO also used narcotics.

338.    CHS-2, 4, 5, 8, 11, 12, 13, 14, 17, 18, 22, 23, 24, 27, 28, 29, 30, 32, 40 and 42 reported that inmates often had people on the outside moving drugs and money or helping those inmates obtain drugs while inside the facility.

339.    CHS-5, 8, 10, 12, 17, 18, 19, 20, 23, 29, 39, and 42 reported inmates use CashApp to pay for drugs and the CashApp accounts are maintained by the inmate's family or friends.

340.    CHS-5, 8, 9, 10, 11, 12, 13, 14, 18, 19, 20, 22, 23, 24, 25, 29, 32, 40, 41 and 42 reported

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

that there were dirty COs at CCCC, who would smuggle drugs and other contraband in for inmates.

341.    CHS-5, 8, 10, 13, 14, 23, and 39 reported that they knew of inmates with a cell phone, a smart phone, and believed that the inmate checked their CashApp via the contraband cell phone.

342.    CHS-3, 10, 12, and 14 reported that inmates with jobs—including porters—could more easily get cell phones and deal drugs.

343.    CHS-42 reported that they had observed a boat of fentanyl pills inside CCCC. Usually there is a delivery of dope into the facility every week.

<u>Adolfo Montano, Kimberly and Kelly Perry</u>

344.    While employed as a CO at CCCC, KIMBERLY PERRY was in an unapproved, likely sexual, relationship with inmate RAUL LOPEZ. KIMBERLY PERRY was also suspected of bringing drugs into CCCC. KIMBERLY PERRY was terminated in June 2024, after CCCC administration learned about the unapproved relationship with LOPEZ.

345.    In November 2023, a cell phone was located and determined to belong to LOPEZ. The cell phone was subsequently seized and searched by law enforcement; a photograph of KIMBERLY PERRY was located on the cell phone.

346.    KELLY PERRY was also employed as a CO at the facility. KELLY PERRY quit working for CCCC in June 2024, after CCCC administration confronted her about smuggling drugs into the facility.

347.    KIMBERLY PERRY was a CO at the facility and she was terminated in June 2024 for not showing up to work. While employed at CCCC, her shift supervisor was MONTANO.

348.    In July 2024, CHS-4 reported that a CCCC Captain named ADOLFO MONTANO, night captain, was in charge of the porters. Porters are inmates that are given jobs in the facility. One of MONTANO's porters, a paisa from Texas named LUIS MARISCAL-LOPEZ, aka: "BOOBOO,"

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

was caught with 2 boats (2,000 fentanyl pills).

349.    Within the last six weeks, CHS-5 reported, that the porters move drugs around the CCCC. CHS-5 reported that MONTANO directed the porters to move drugs around CCCC.

350.    CHS-5 reported that MONTANO used drugs and imported them into the facility.

351.    Within the month of September, 2024, CCCC staff reported that MONTANO had purchased an expensive truck while being employed at CCCC. Staff also reported that MONTANO's income did not appear to be enough to support his family and purchase the brand-new truck.

352.    CHS-12 reported that a female CO brought drugs into the facility. The CO drove a dodge Challenger and CHS-12 reported that the CO purchased the Challenger with illegal drug proceeds, obtained by smuggling drugs into CCCC.

353.    In July 2024, CHS-4 advised agents that they had personal knowledge that TCK gang member FRANCISCO GONZALEZ, aka: "PICASO," MARISCAL-LOPEZ, and Brew Town Locos ("BTL") associate MARQUIS CRUZ, aka: "WEEZY,"[27] were using KIMBERLY and KELLY PERRY, sisters and COs, to bring blues into CCCC. MONTANO was also bringing dope into the facility. The CHS also heard MARISCAL-LOPEZ and GONZALEZ brag about being in sexual relationships with KIMBERLY PERRY and KELLY PERRY. The CHS explained that they knew all of this information, because they either heard the subjects say it, they were previously involved in CCCC drug trafficking, and/or they observed a kite (a discreet letter between inmates) from MARISCAL-LOPEZ to GONZALEZ confirming all of the above.

354.    CHS-5 reported that a CO that was fired for introducing drugs into CCCC for CRUZ.

---

[27] MARQUIS CRUZ was arrested by the VGTF and later convicted of possession with intent to distribute fentanyl, possession of a firearm in furtherance of a drug trafficking crime, and possession of a firearm by a convicted felon, Case No. 1:22-cr-01722-KWR.

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

355.    By way of background, CRUZ was arrested by the NMSP in September 2022, and later arrested by the VGTF. At the time of CRUZ's initial arrest, he was in possession of the two pistols, one of which was stolen, and ammunition; approximately $3,969; and approximately 1,746 fentanyl pills. Also, in May 2023, CCCC searched CRUZ and PILGRIM's cell and located 26 grams of methamphetamine and 178 blue fentanyl pills.

356.    In late August 2024, CCCC analyzed recorded jail phone calls and observed a call between USMS CAMERON PILGRIM and KELLY PERRY. PERRY asked PILGRIM why he didn't take the plea agreement. PILGRIM responded that he wanted to stay at Cibola longer so he could get her, now that he got her he wants to move on.

357.    In Early September 2024, CCCC analyzed recorded phone contact between released USMS inmate MARQUAE KIRKENDOLL and inmate USMS CAMERON PILGRIM.

358.    KIRKENDOLL was subsequently released from USMS and is currently on federal supervised release regarding a conviction of conspiracy, Case No. 1:22-cr-00361-MLG.

359.    Contained in the phone contact is the following conversation. KIRKENDOLL asked PILGRIM, "I'm tryna get to that business doe what's yo new girl #?" PILGRIM gave the number to KIRKENDOLL. KIRKENDOLL told PILGRIM that he was trying to get the drugs together on the street because he had everything ready, he just needed the drugs.

360.    In a subsequent conversation, KIRKENDOLL discussed the possible introduction of drugs through the mail, PILGRIM voiced concerns about KIRKENDOLL getting the envelope correct. KIRKENDOLL reassured PILGRIM that he knew what he was doing and that PILGRIM's lady (KELLY PERRY) would have something at her door this week.

361.    PILGRIM then sent a message to KELLY PERRY, PILGRIM said that he gave "Quae" (MARQUAE KIRKENDOLL) her number. He then asked if she regreted choosing him, wonders

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

if he was a big mistake, and asks if she would have rather kept her job or kept him.

362.    CHS-23 and 25 reported that KIMBERLY PERRY and KELLY PERRY smuggled drugs into CCCC, specifically for inmates housed in the 600 unit.

363.    CHS-43 reported that they had sold drugs while being incarcerated at CCCC. CHS-43 reported that they used MONTANO to bring the various narcotics into the facility.

364.    CHS-4, 25, and 41 reported that MONTANO was facilitating drug trafficking within CCCC. Specifically, MONTANO would bring the drugs into the facility himself and MONTANO also used narcotics.

365.    CHS-42 reported that they believed female COs were bringing the dope into the facility.

366.    In September 2024, CHS-4 reported that KELLY and KIMBERLY PERRY had brought drugs into CCCC.

367.    CHS-5 reported that KIRKENDOLL trafficked drugs with other inmates.

368.    CHS-10 reported that there were a lot of drugs in CCCC, and an inmate could obtain any kind of drug they wanted. CHS-10 reported that guards and employees were involved in importing the drugs into CCCC. CHS-10 reported that inmates paid for drugs via CashApp.

369.    CHS-12 reported that COs charged $5,000 to smuggle drugs and $2,000 to smuggle cell phones into CCCC.

370.    CHS-13 reported that they knew of a CO who was fired from CCCC due to a sexual encounter with an inmate. CHS-13 reported that the CO was smuggling contraband into the facility. CHS-13 knew that on one occasion, the CO was paid $7,500 to smuggle drugs in, however the CO was fired before he could deliver the package and kept the money. CHS-13 reported that the CO was very friendly with the inmates.

371.    CHS-2, 4, 5, 8, 11, 12, 13, 14, 17, 18, 22, 23, 24, 27, 28, 29, 30, 32, 40 and 42 reported that

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

inmates often had people on the outside moving drugs and money or helping those inmates obtain drugs while inside the facility.

372.    CHS-5, 8, 10, 12, 17, 18, 19, 20, 23, 29, 39, and 42 reported inmates use CashApp to pay for drugs and the CashApp accounts are maintained by the inmate's family or friends.

373.    CHS-5, 8, 9, 10, 11, 12, 13, 14, 18, 19, 20, 22, 23, 24, 25, 29, 32, 40, 41 and 42 reported that there were dirty COs at CCCC, who would smuggle drugs and other contraband in for inmates.

374.    CHS-5, 10, 13, 14, 23, and 39 reported that they knew of inmates with a cell phone, a smart phone, and believed that the inmate checked their CashApp via the contraband cell phone.

375.    CHS-3, 10, 12, and 14 reported that inmates with jobs could more easily get cell phones and deal drugs.

## CRIMINAL HISTORY OF THE TARGET SUBJECTS

376.    **Target Subject 1:** NORA BACA was indicted by a Federal Grand Jury and charged with possession with intent to distribute methamphetamine and fentanyl, and possession of a firearm in furtherance of a drug trafficking crime, Case No. 23-CR-953-KWR. BACA is an AB associate and has at least 11 prior arrests in New Mexico. BACA has felony convictions for possession of a controlled substance and two counts of forgery.

377.    **Target Subject 2:** ESTRELLA GONZALEZ is a TCK and Nuevo associate and has at least 11 prior arrests in New Mexico. GONZALEZ has no felony convictions.

378.    **Target Subject 3:** ANGELO GARCIA is a Northside gang member with no prior arrests.

379.    **Target Subject 4:** MONALISA VARGAS a Nuevo associate and has at least 14 prior arrests in New Mexico. MONALISA VARGAS has a felony conviction for possession of a controlled substance.

380.    **Target Subject 5:** THERESA ATENCIO is a Nuevo associate and has at least six (6) prior

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

arrests in New Mexico. ATENCIO has no felony convictions.

381.    **Target Subject 6:** JOHNNY VALITERRA, aka: "CHOPPER," is a WSL gang member who has at least seven (7) prior arrests in New Mexico. VALITERRA has felony convictions for conspiracy to receive stolen property, contributing to the delinquency of a minor, and possession with intent to distribute fentanyl.

382.    **Target Subject 7:** RICHARD PORRAS, aka "DEUCE," is a WSL gang member who has at least 21 prior arrests in New Mexico. PORRAS has felony convictions for possession of a controlled substance, conspiracy to receive stolen property, 2x commercial burglary, theft of identity, theft of a credit card, distribution of 50 grams and more of a mixture and substance containing methamphetamine, using and carrying a firearm during and in relation to a drug trafficking crime, and possessing a firearm in furtherance of a drug trafficking crime.

383.    **Target Subject 8:** SONIA TRINIDAD is a Nuevo associate and has two (2) prior arrests in New Mexico. TRINIDAD has a felony conviction for accessory after the fact stemming from a bank robbery. TRINIDAD is currently serving a term of supervised release after being convicted of accessory after the fact relating to a bank robbery, the case was investigated by the FBI, Case No. 1:22-cr-01508-WJ.

384.    **Target Subject 9:** DESIREE BENAVIDEZ is a Nuevo associate has no prior arrests or felony convictions.

385.    **Target Subject 10:** ANA ROMERO has one prior arrest in New Mexico or felony convictions.

386.    **Target Subject 11:** ADOLFO MONTANO has no prior arrests or felony convictions.

387.    **Target Subject 12:** KIMBERLY PERRY has no prior arrests or felony convictions.

388.    **Target Subject 13:** KELLY PERRY has no prior arrests or felony convictions.

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

389.  **Target Subject 14:** MONIQUE GALLEGOS is on state probation for a charge of receiving stolen property, Case No. D-1333-CR-2023-00012. GALLEGOS is a Nuevo associate and has at least eight (8) prior arrests. GALLEGOS has felony convictions for receiving stolen property, forgery, and harboring or aiding a felon.

390.  **Target Subject 15:** DAVID HICKS is a Nuevo associate and has at least 15 prior arrests. HICKS has felony convictions for aggravated DWI (5th offense) and possession of a firearm by a convicted felon.

## THE SUBJECT PREMISES

391.  **Subject Premises A-1**: I believe NORA BACA lives at Subject Premises A-1, located at 417 Monte Alto Place NE Albuquerque, NM, 87123. Subject Premises A-1 may be described as a split level residence, with light brown stucco siding, brown trim, a brown garage door, and a flat roof. The numbers 417 are posted on the sidewalk in front of the residence. The front door is brown. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-1.

Indicia of Residence

   a) BACA's valid New Mexico driver's license lists the Subject Premises as her residence.

   b) Open source records list the Subject Premises as BACA's residence.

   c) CHS-9, 35, 36, and 38 reported that BACA lives at Subject Premises A-1.

   d) VGTF surveillance has observed BACA's vehicle at the Subject Premises on multiple different occasions.

392.  **Subject Premises A-2:** I believe ESTRELLA GONZALEZ lives at Subject Premises A-2, located at 1812 Del Norte Drive SW, Albuquerque, NM 87105. Subject Premises A-2 may be

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

described as a single story residence, with light brown stucco siding, white bars over the windows, with a wooden porch. The numbers 1812 are posted on the mailbox in front of the Subject Premises. There are video cameras posted all over the exterior of the property. There is a large garage and a camper located on the property. Color photographs of the Subject Premises have been attached and incorporated in Attachment A-2.

Indicia of Residence

a) According to county records, GONZALEZ's associate, JERRY BEZIE, owns the Subject Premises.

b) State court documents have listed the Subject Premises as the residence of record for GONZALEZ.

c) A truck, registered to BEZIE, is regularly parked in the front yard of the Subject Premises.

d) Open source records list the Subject Premises as GONZALEZ's residence.

e) Within the last two weeks, surveillance agents have observed GONZALEZ at the Subject Premises.

f) Within the last month, LUPE VARGAS sent a letter to ESTRELLA GONZALEZ at Subject Premises A-2.

g) Surveillance agents regularly observe vehicles with stolen tags at the Subject Premises.

h) CHS-21 and CHS-27 reported that GONZALEZ lives at Subject Premises A-2.

393. **Subject Premises A-3:** I believe ANGELO GARCIA lives at Subject Premises A-3, located at 4903 Rincon Rd NW, Albuquerque, NM 87105. Subject Premises A-3 may be described as a single story residence, with brown stucco siding, brown trim, and a red metal roof. The

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

numbers 4903 are posted on the mailbox in front of the residence. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-3.

<u>Indicia of Residence</u>

    a)  GARCIA's valid New Mexico driver's license lists the Subject Premises as his address.

    b)  Open source records list the Subject Premises as GARCIA's residence.

    c)  CHS-1 and CHS-29 reported GARCIA lives at Subject Premises A-3.

    d)  VGTF surveillance units have observed GARCIA at the residence on multiple different occasions.

394.   **Subject Premises A-4:** I believe MONALISA VARGAS lives at Subject Premises A-4, located at 1333 Columbia Dr. SE, apartment #95, Albuquerque, NM 87106. Subject Premises A-4 may be described as a multi-unit apartment complex with tan stucco siding and a green door. The numbers 1333 are posted the buildings inside the complex and the number 95 is posted on the door to Subject Premises A-4. Color photographs of the Subject Premises have been attached and incorporated in Attachment A-4

    <u>Indicia of Residence</u>

    a)  Within the last week, the property manager confirmed that MONALISA VARGAS lives at the Subject Premises.

    b)  Open source records list the Subject Premises as MONALISA VARGAS's residence.

    c)  Within the last three weeks, surveillance agents have observed MONALISA VARGAS enter and exit the Subject Premises.

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

    d) Several times within the last month, surveillance agents have observed a vehicle, registered to MONALISA VARGAS, parked at the Subject Premises.

    e) CHS-33, 34, CHS-38 reported that MONALISA VARGAS lives at Subject Premises A-4.

395.  **Subject Premises A-5:** I believe THERESA ATENCIO lives at Subject Premises A-5, located at 9748 Summer Shower Pl NW, Albuquerque, NM 87120. Subject Premises A-5 may be described as a two story residence with tan stucco siding and a tan terracotta roof. The numbers 9748 are posted on the front of the house to the left of the garage door. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-5.

    <u>Indicia of Residence</u>

    a) ATENCIO's valid New Mexico driver's license lists the Subject Premises as her residence.

    b) Within the last month, surveillance agents observed ATENCIO's black dodge pickup parked in the driveway of the Subject Premises on a near daily basis. The vehicle is registered to ATENCIO. The last time surveillance agents observed ATENCIO's vehicle parked in the driveway of the subject Premises was within the last week.

    c) Open source records list the Subject Premises as ATENCIO's residence.

    d) According to county records, ATENCIO owns the Subject Premises.

    e) CHS-31 reported that ATENCIO lives at Subject Premises A-5.

396.  **Subject Premises A-6:** I am aware JOHNNY VALITERRA, aka: "CHOPPER," lives in the men's dormitory at the Diersen Charities halfway house (Subject Premises A-6), located at 2331 Menaul Boulevard NE, Albuquerque, New Mexico, 8710. FBI agents will request Diersen

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

staff point out the bed/sleeping area, closet, storage container(s), locker(s), shelves, drawers, or other spaces designated for use by VALITERRA, and agents will search those areas. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-6.

Indicia of Residence

 a) VALITERRA's valid New Mexico driver's license lists the Subject Premises as his residence.

 b) VALITERRA is on federal supervised release, and the Subject Premises is his listed address with US Probation.

397. **Subject Premises A-7:** I am aware RICHARD PORRAS, aka: "DEUCE," lives in the men's dormitory at the Diersen Charities halfway house (Subject Premises A-6), located at 2331 Menaul Boulevard NE, Albuquerque, New Mexico, 8710. FBI agents will request Diersen staff point out the bed/sleeping area, closet, storage container(s), locker(s), shelves, drawers, or other spaces designated for use by PORRAS, and agents will search those areas. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-7.

Indicia of Residence

 a) PORRAS's valid New Mexico driver's license lists the Subject Premises as his residence.

 b) Open source records list the Subject Premises as PORRAS's residence.

 c) PORRAS is on federal probation, and the Subject Premises is his listed address with US Probation.

398. **Subject Premises A-8**: I believe SONIA TRINIDAD lives at Subject Premises A-8, located at 401 Dunes Court, Apartment D, Albuquerque, NM 87123. Subject Premises A-8 may be described as a two story multi-unit apartment complex with brick siding with white trim, with

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

a white metal security door. The letter D is posted on the door to the Subject Premises. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-8, the door to the Subject Premises is circled in red.

Indicia of Residence

a) TRINIDAD is on federal probation, and the Subject Premises is her listed address with US Probation.

b) Within the last month, surveillance agents observed a vehicle, registered to TRINIDAD, parked out front of the Subject Premises.

c) CHS-21 reported that TRINIDAD lives at the Subject Premises.

399. **Subject Premises A-9:** I believe DESIREE BENAVIDEZ lives at Subject Premises A-9, located at 3 Jose P Sanchez Rd, Los Lunas, NM 87031. Subject Premises A-9 may be described as a trailer home with white siding and a gray shingle roof. There is a red ramp to the door, a red and green gate at the end of the driveway, next to the street, and a camper located on the property. The number 3 is posted on the mailbox in front of the Subject Premises. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-9.

Indicia of Residence

a) BENAVIDEZ's valid New Mexico driver's license lists the Subject Premises as her residence.

b) BENAVIDEZ has one vehicle registered to her at the Subject Premises.

c) Open source records list the Subject Premises as BENAVIDEZ's residence.

d) Law enforcement records list the Subject Premises as BENAVIDEZ's residence.

e) Court records list the Subject Premises as BENAVIDEZ's residence.

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

f) Within the last month, surveillance agents have regularly observed multiple vehicles at the Subject Premises. Due to the large layout of the property, it is difficult for agents to observe all of the license plates. However, agents have regularly observed a vehicle parked at the Subject Premises, which is registered to BENAVIDEZ's brother, ISAAC.

g) Agents spoke with a concerned citizen who lives in the area, the concerned citizen advised that BENAVIDEZ lives at the Subject Premises.

400.    **Subject Premises A-10:** I believe ANA ROMERO lives at Subject Premises A-10, located at 200 E. Jefferson Ave. Gallup, New Mexico 87301. Subject Premises A-10 may be described as single story residence with red stucco siding, a brown shingle roof, and white trim. The numbers and letter 200 E are posted on the mailbox in front of the Subject Premises. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-10.

Indicia of Residence

a) ROMERO has one vehicle registered to her at Subject Premises A-10.

b) Open source records list Subject Premises A-10 as ROMERO's residence.

c) Within the last month, ROMERO had a video visit with USMS inmate FERMIN AGUILERA. During the video call, the Subject Premises is observed in the background.

d) CHS-5 reported that ROMERO lives in Gallup, NM. Subject Premises A-10 is located in Gallup, NM.

e) Within the last month, surveillance agents observed vehicles registered to ROMERO's parents at the Subject Premises.

401.    **Subject Premises A-11:** I believe ADOLFO MONTANO lives at Subject Premises A-11,

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

18 Arroyoito Loop, Seboyeta, NM 87014.[28] Subject Premises A-11 may be described as a trailer home with tan siding, white trim, with a gray metal roof. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-11.

> Indicia of Residence
>
> a)  MONTANO's New Mexico driver's license lists Subject Premises A-11 as his residence.
>
> b)  MONTANO has two vehicles registered to him at Subject Premises A-11.
>
> c)  Open source records list Subject Premises A-11 as MONTANO's residence.
>
> d)  Court records list Subject Premises A-11 as MONTANO's residence.
>
> e)  County records list MONTANO as the owner of Subject Premises A-11.
>
> f)  MONTANO provided Subject Premises A-11 as his residence on employment records.
>
> g)  Within the last week, surveillance agents observed a 2024 Ram pickup parked at the Subject Premises. The vehicle is registered to MONTANO.

402.  **Subject Premises A-12:** I believe KIMBERLY PERRY and KELLY PERRY live at Subject Premises A-12, located at 8 Red Mesa Housing, Crownpoint, NM 87313. Subject Premises A-12 may be described as a single story residence, with brown stucco siding, white trim and a gray shingle roof. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-12.

403.  Indicia of Residence

> a)  KIMBERLY PERRY and KELLY PERRY's New Mexico driver's licenses list

---

[28] According to google maps, Subject Premises A-11 may be referred to as 18 Arroyoito Loop, Paguate, NM 87040, however the address on MONTANO's driver's license is 18 Arroyoito Loop, Seboyeta, NM 87014.

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

Subject Premises A-12 as their residence.

b) Open source records list Subject Premises A-12 as KIMBERLY PERRY and KELLY PERRY's address.

c) Police reports list Subject Premises A-12 as KIMBERLY PERRY and KELLY PERRY's residence.

d) While employed at CCCC, in June of 2024, KELLY PERRY provided Subject Premises A-12 as her address.

e) Within the last week surveillance agents observed vehicles registered to both KELLY and KIMBERLY PERRY parked in the driveway of the Subject Premises.

404. **Subject Premises A-13:** I believe MONIQUE GALLEGOS and DAVID HICKS live at Subject Premises A-13, located at 7 Hughes Blvd, Grants, NM 87020.[29] Subject Premises A-13 may be described as a cabin style residence which is tan, brown, and gray in color with white and wood trim. A color photograph of the Subject Premises has been attached and incorporated in Attachment A-13.

405. Indicia of Residence

a) HICKS's driver's license lists the Subject Premises as his residence.

b) According to county records, the entirety of the Subject Premises is owned by HICKS's parents.[30]

c) Police records list the Subject Premises as HICKS's residence.

d) GPD officers have arrested HICKS at the Subject Premises and have known him to

---

[29] There is a large wooden shed which crosses over the property line, from 7 Hughes Blvd, Grants, NM 87020, to the adjoining property, identified as 2201 West Highway 66, Grants, NM 87020. This warrant authorizes agents to search both of the above listed properties, as they share a building.

[30] Both 7 Hughes Blvd, Grants, NM 87020 and 2201 West Highway 66, Grants, NM 87020 are owned by HUGHES's parents.

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

live at the Subject Premises for approximately five (5) years.

e)  On multiple occasions within the last year, surveillance agents have observed HICKS at the Subject Premises.

## Search Limitations

406.    The search of Subject Premises A-1 thru A-3, A-5, and A-9 thru A-13 (the residences) shall include the entire residences and all outbuildings, trash cans, and storage containers designated for use by the respective Subject Premises occupants. The search shall also include vehicles parked at, or in front of, the Subject Premises provided such vehicle(s) has an apparent connection to the Subject Premises. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission or possession of an ignition key.

407.    The search of Subject Premises A-4 and A-8 (the apartments) shall include the entire apartment, including vehicles that have an apparent connection to the Subject Premises. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission or possession of an ignition key.

408.    The search of Subject Premises A-6 and A-7 (Diersen Charities) shall include the bed/sleeping area, closet(s), storage container(s), locker(s), shelves, drawers, or any other spaces designated for use by JOHNNY VALITERRA, aka: "CHOPPER," and RICHARD PORRAS, aka: "DEUCE." FBI agents executing the search warrant will request Diersen Charities staff assist agents in pointing out which bed/sleeping area, closet(s), storage container(s), locker(s), shelves, drawers, or other spaces designated for use by JOHNNY VALITERRA, aka: "CHOPPER," and RICHARD PORRAS, aka: "DEUCE."

## BIOMETRIC ACCESS TO DEVICES

409.    I know from my training and experience, as well as from information found in publicly

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

410.    If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

411.    If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

412.    If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

413.    In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

414.    As discussed in this Affidavit, I have reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

415.    I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, is inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device may exist for only a short time.

416.    Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, I request permission to: (1) press or swipe the fingers (including thumbs) of the Target Subjects to the fingerprint scanner of the devices found at the Subject Premises; (2) hold the devices found at the Subject Premises in front of the face of the Target Subjects and activate the facial recognition feature; and/or (3) hold the devices found at the Subject Premises in front of the face of the Target Subjects and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to request that the Target Subjects state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to ask the Target Subjects to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

## CONCLUSION

417.    Based on the foregoing, I believe that there is probable cause to believe that evidence of violations of 21 U.S.C. §§ 841(a) Possession with Intent to Distribute Controlled Substances, 843(b) Use of a Communication Facility in Furtherance of Drug Trafficking, 846 Conspiracy to Distribute Controlled Substances, 18 U.S.C. §§ 1956(a)(1) Money Laundering, 1791 Providing or

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

Possessing Contraband in a Jail Facility, 666 Theft or Bribery Concerning Programs Receiving Federal Funds, 371 Conspiracy, and § 2 Aiding and Abetting as more particularly described in Attachment B will be found at Subject Premises A-1 thru A-13 and on the Target Subjects. Therefore, I submit that this affidavit supports probable cause for Attachment B.

418.   This affidavit was reviewed by Assistant United States Attorneys Paul Mysliwiec and David Hirsch.

Respectfully submitted,

Jordan Spaeth
FBI Special Agent

Electronically signed and telephonically sworn to me on October __29__, 2024.

Steven C. Yarbrough
United States Magistrate Judge
District of New Mexico

116

**ATTACHMENT A-1**
**Person and Premises to be Searched**

<u>Premises to be Searched:</u> Subject Premises A-1 is located at 417 Monte Alto Place NE Albuquerque,
NM, 87123. Subject Premises A-1 may be described as a split level residence, with light brown stucco
siding, brown trim, a brown garage door, and a flat roof. The numbers 417 are posted on the curb in
front of the residence. The front door is brown. A color photograph of the Subject Premises is contained
below.



Surveillance photo

The search of Subject Premises A-1 shall include the entire residence and all outbuildings, trash cans, and
storage containers designated for use by the occupants of the Subject Premises. The search shall also
include vehicles parked at, or in front of, the Subject Premises provided such vehicle has an apparent
connection to the Subject Premises. Connection to the Subject Premises may be established by way of
prior law enforcement observation, vehicle registration, subject admission or possession of an ignition
key.

<u>Biometric Access to Devices:</u> During the execution of the search of the premises described herein, law
enforcement officers are also specifically authorized to compel any individual, who is found at the Subject
Premises and reasonably believed by law enforcement to be a user of the device, to provide biometric

**ATTACHMENT A-1**
**Person and Premises to be Searched**

features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of:

1. Any devices found at the premises, and

2. Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant.

3. This warrant authorizes law enforcement personnel to compel any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device. Further, this warrant does not authorize law enforcement personnel to request that the individual state or otherwise provide the password or any other means that may be used to unlock or access another person's device(s), including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

Page 2

**ATTACHMENT A-2**
**Person and Premises to be Searched**

<u>Premises to be Searched:</u> Subject Premises 1 is located at 1812 Del Norte Drive SW, Albuquerque, NM 87105, and may be described as a single story residence, with light brown stucco siding, white bars over the windows, with a wooden porch. The numbers 1812 are posted on the mailbox in front of the Subject Premises. There are video cameras posted all over the exterior of the property. There is a large garage and a camper located on the property. A color photograph of the Subject Premises is contained below.



Surveillance photo

The search of Subject Premises A-2 shall include the entire residence and all outbuildings, trash cans, and storage containers designated for use by the occupants of the Subject Premises. The search shall also include vehicles parked at, or in front of, the Subject Premises provided such vehicle has an apparent connection to the Subject Premises. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission or possession of an ignition key.

<u>Biometric Access to Devices:</u> During the execution of the search of the premises described herein, law enforcement officers are also specifically authorized to compel any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of:

Page 1

**ATTACHMENT A-2**
**Person and Premises to be Searched**

1. Any devices found at the premises, and

2. Where the devices are limited to those which are capable of containing and reasonably could
   contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as
   described in the search warrant affidavit and warrant attachments for the purpose of attempting
   to unlock the devices' security features in order to search the contents as authorized by this
   warrant.

3. This warrant authorizes law enforcement personnel to compel any individual, who is found at
   the Subject Premises and reasonably believed by law enforcement to be a user of the device,
   to provide biometric features, as described in the preceding paragraph, to access or otherwise
   unlock any device. Further, this warrant does not authorize law enforcement personnel to
   request that the individual state or otherwise provide the password or any other means that may
   be used to unlock or access another person's device(s), including by identifying the specific
   biometric characteristics (including the unique finger(s) or other physical features) that may
   be used to unlock or access the devices.

**ATTACHMENT A-3**
**Person and Premises to be Searched**

<u>Premises to be Searched:</u> Subject Premises A-3 is located at 4903 Rincon Rd NW, Albuquerque, NM

87105, and may be described as a single story residence, with brown stucco siding, brown trim, and a

red metal roof. The numbers 4903 are posted on the mailbox in front  of the residence. A color

photograph of the Subject Premises is contained below.



Surveillance photo

The search of Subject Premises A-3 shall include the entire residence and all outbuildings, trash cans, and

storage containers designated for use by the occupants of the Subject Premises. The search shall also

include vehicles parked at, or in front of, the Subject Premises provided such vehicle has an apparent

connection to the Subject Premises. Connection to the Subject Premises may be established by way of

prior law enforcement observation, vehicle registration, subject admission or possession of an ignition

key.

<u>Biometric Access to Devices:</u> During the execution of the search of the premises described herein, law

enforcement officers are also specifically authorized to compel any individual, who is found at the Subject

Premises and reasonably believed by law enforcement to be a user of the device, to provide biometric

**ATTACHMENT A-3**
**Person and Premises to be Searched**

features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of:

1. Any devices found at the premises, and

2. Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant.

3. This warrant authorizes law enforcement personnel to compel any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device. Further, this warrant does not authorize law enforcement personnel to request that the individual state or otherwise provide the password or any other means that may be used to unlock or access another person's device(s), including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

**ATTACHMENT A-4**
**Person and Premises to be Searched**

<u>Premises to be Searched:</u> Subject Premises A-4 is located at 1333 Columbia Dr. SE, apartment #95,

Albuquerque, NM 87106, and may be described as a multi-unit apartment complex with tan stucco

siding, white trim, with gray shingle roofs. The numbers 1333 are posted the buildings inside the

complex and the number 95 is posted on the door to Subject Premises A-4. Color photographs of the

Subject Premises are contained below.



Surveillance photo



Google Streetview photo

**ATTACHMENT A-4**
**Person and Premises to be Searched**

The search of Subject Premises A-4 shall include the entire apartment, including vehicles that have an apparent connection to the Subject Premises. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission or possession of an ignition key.

Biometric Access to Devices: During the execution of the search of the premises described herein, law enforcement officers are also specifically authorized to compel any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of:

1. Any devices found at the premises, and

2. Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant.

3. This warrant authorizes law enforcement personnel to compel any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device. Further, this warrant does not authorize law enforcement personnel to request that the individual state or otherwise provide the password or any other means that may be used to unlock or access another person's device(s), including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

**ATTACHMENT A-5**
**Person and Premises to be Searched**

<u>Premises to be Searched:</u> Subject Premises A-5 is located at 9748 Summer Shower Pl NW,

Albuquerque, NM 87120, and may be described as a two story residence with tan stucco siding and a tan

terracotta roof. The numbers 9748 are posted on the front of the house to the left of the garage door. A

color photograph of the Subject Premises is contained below.



Google Streetview photo

The search of Subject Premises A-5 shall include the entire residence and all outbuildings, trash cans, and

storage containers designated for use by the occupants of the Subject Premises. The search shall also

include vehicles parked at, or in front of, the Subject Premises provided such vehicle has an apparent

connection to the Subject Premises. Connection to the Subject Premises may be established by way of

prior law enforcement observation, vehicle registration, subject admission or possession of an ignition

key.

**ATTACHMENT A-5**
**Person and Premises to be Searched**

<u>Biometric Access to Devices:</u> During the execution of the search of the premises described herein, law enforcement officers are also specifically authorized to compel any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of:

1. Any devices found at the premises, and

2. Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant.

3. This warrant authorizes law enforcement personnel to compel any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device. Further, this warrant does not authorize law enforcement personnel to request that the individual state or otherwise provide the password or any other means that may be used to unlock or access another person's device(s), including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

**ATTACHMENT A-6**
**Person and Premises to be Searched**

<u>Premises to be Searched:</u> Subject Premises A-6 is located within the Diersen Charities halfway house, located at 2331 Menaul Boulevard NE, Albuquerque, New Mexico, 8710. FBI agents will request Diersen staff point out the bed/sleeping area, closet(s), storage container(s), locker(s), shelves, drawers, or other spaces designated for use by JOHNNY VALITERRA, aka: "CHOPPER," and agents will search those areas. A color photograph of the Subject Premises is contained below.



Google Streetview photo

The search of Subject Premises A-6 shall be restricted to the bed/sleeping area, closet(s), storage container(s), locker(s), shelves, drawers, or other spaces designated for use by VALITERRA. The search shall also include VALITERRA's vehicle and may be established by way of prior law enforcement or Diersen staff observation, vehicle registration, subject admission or possession of an ignition key.

<u>Biometric Access to Devices:</u> During the execution of the search of the premises described herein, law enforcement officers are also specifically authorized to compel VALITERRA, to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of:

1. Any devices found at the premises, and

2. Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as

**ATTACHMENT A-6**
**Person and Premises to be Searched**

described in the search warrant affidavit and warrant attachments for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant.

3.  This warrant authorizes law enforcement personnel to compel VALITERRA to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device. Further, this warrant does not authorize law enforcement personnel to request that the individual state or otherwise provide the password or any other means that may be used to unlock or access another person's device(s), including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

**ATTACHMENT A-7**
**Person and Premises to be Searched**

<u>Premises to be Searched:</u> Subject Premises A-7 is located within the Diersen Charities halfway house, located at 2331 Menaul Boulevard NE, Albuquerque, New Mexico, 8710. FBI agents will request Diersen staff point out the bed/sleeping area, closet(s), storage container(s), locker(s), shelves, drawers, or other spaces designated for use by RICHARD PORRAS, aka: "DEUCE," and agents will search those areas. A color photograph of the Subject Premises is contained below.



Google Streetview photo

The search of Subject Premises A-7 shall be restricted to the bed/sleeping area, closet(s), storage container(s), locker(s), shelves, drawers, or other spaces designated for use by PORRAS. The search shall also include PORRAS's vehicle and may be established by way of prior law enforcement or Diersen staff observation, vehicle registration, subject admission or possession of an ignition key.

<u>Biometric Access to Devices:</u> During the execution of the search of the premises described herein, law enforcement officers are also specifically authorized to compel PORRAS, to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of:

1.  Any devices found at the premises, and

2.  Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as

Page 1

**ATTACHMENT A-7**
**Person and Premises to be Searched**

described in the search warrant affidavit and warrant attachments for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant.

3. This warrant authorizes law enforcement personnel to compel VALITERRA to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device. Further, this warrant does not authorize law enforcement personnel to request that the individual state or otherwise provide the password or any other means that may be used to unlock or access another person's device(s), including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

**ATTACHMENT A-8**
**Person and Premises to be Searched**

<u>Premises to be Searched:</u> Subject Premises A-8 is located at 401 Dunes Court, apartment D,

Albuquerque, NM 87123, and may be described as a two story multi-unit apartment complex with brick

siding with white trim, with a white metal security door. The letter D is posted on the door to the Subject

Premises, which is circled in red in the below photograph. A color photograph of the Subject Premises is

contained below.



Surveillance photo

The search of Subject Premises A-8 shall include vehicles that have an apparent connection to the Subject

Premises. Connection to the Subject Premises may be established by way of prior law enforcement

observation, vehicle registration, subject admission or possession of an ignition key.

<u>Biometric Access to Devices:</u> During the execution of the search of the premises described herein, law

enforcement officers are also specifically authorized to compel any individual, who is found at the Subject

Premises and reasonably believed by law enforcement to be a user of the device, to provide biometric

features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or

any other security feature requiring biometric recognition, of:

    1.  Any devices found at the premises, and

**ATTACHMENT A-8**
**Person and Premises to be Searched**

2.  Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant.

3.  This warrant authorizes law enforcement personnel to compel any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device. Further, this warrant does not authorize law enforcement personnel to request that the individual state or otherwise provide the password or any other means that may be used to unlock or access another person's device(s), including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

**ATTACHMENT A-9**
**Person and Premises to be Searched**

<u>Premises to be Searched:</u> Subject Premises A-9 is located at 3 Jose P Sanchez Rd, Los Lunas, NM

87031, and may be described as a trailer home with white siding and a gray shingle roof. There is a red

ramp to the door, a red and green gate at the end of the driveway, next to the street, and a camper located

on the property. The number 3 is posted on the mailbox in front of the Subject Premises. Color

photographs of the Subject Premises are contained below.



Surveillance photo



Google Streetview photo

The search of Subject Premises A-9 shall include the entire residence and all outbuildings, trash cans, and

storage containers designated for use by the occupants of the Subject Premises. The search shall also

include vehicles parked at, or in front of, the Subject Premises provided such vehicle has an apparent

connection to the Subject Premises. Connection to the Subject Premises may be established by way of

**ATTACHMENT A-9**
**Person and Premises to be Searched**

prior law enforcement observation, vehicle registration, subject admission or possession of an ignition key.

Biometric Access to Devices: During the execution of the search of the premises described herein, law enforcement officers are also specifically authorized to compel any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of:

1.  Any devices found at the premises, and

2.  Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant.

3.  This warrant authorizes law enforcement personnel to compel any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device. Further, this warrant does not authorize law enforcement personnel to request that the individual state or otherwise provide the password or any other means that may be used to unlock or access another person's device(s), including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

**ATTACHMENT A-10**
**Person and Premises to be Searched**

<u>Premises to be Searched:</u> Subject Premises A-10 is located at 200 E. Jefferson Ave. Gallup, New

Mexico 87301, and may be described as a single story residence with red siding, a brown shingle roof,

and white trim. The numbers and letter 200 E are posted on the mailbox in front of the Subject Premises.

A photograph of the Subject Premises is contained below.



Google Streetview photo



Surveillance photo

The search of Subject Premises A-10 shall include the entire residence and all outbuildings, trash cans,

and storage containers designated for use by the occupants of the Subject Premises. The search shall also

**ATTACHMENT A-10**
**Person and Premises to be Searched**

include vehicles parked at, or in front of, the Subject Premises provided such vehicle has an apparent connection to the Subject Premises. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission or possession of an ignition key.

<u>Biometric Access to Devices:</u> During the execution of the search of the premises described herein, law enforcement officers are also specifically authorized to compel any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of:

1. Any devices found at the premises, and

2. Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant.

3. This warrant authorizes law enforcement personnel to compel any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device. Further, this warrant does not authorize law enforcement personnel to request that the individual state or otherwise provide the password or any other means that may be used to unlock or access another person's device(s), including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

**ATTACHMENT A-11**
**Person and Premises to be Searched**

<u>Premises to be Searched:</u> Subject Premises A-11 is located at 18 Arroyoito Loop, Seboyeta, NM 87014,[1] and may be described as a trailer home with tan siding, white trim, with a gray metal roof. Color photographs of the Subject Premises are contained below.



Surveillance photo

The search of Subject Premises A-11 shall include the entire residence and all outbuildings, trash cans, and storage containers designated for use by the occupants of the Subject Premises. The search shall also include vehicles parked at, or in front of, the Subject Premises provided such vehicle has an apparent connection to the Subject Premises. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission or possession of an ignition key.

<u>Biometric Access to Devices:</u> During the execution of the search of the premises described herein, law enforcement officers are also specifically authorized to compel any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of:

---

[1] According to google maps, Subject Premises A-11 may be referred to as 18 Arroyoito Loop, Paguate, NM 87040, however the address on MONTANO's driver's license is 18 Arroyoito Loop, Seboyeta, NM 87014.

**ATTACHMENT A-11**
**Person and Premises to be Searched**

1. Any devices found at the premises, and

2. Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant.

3. This warrant authorizes law enforcement personnel to compel any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device. Further, this warrant does not authorize law enforcement personnel to request that the individual state or otherwise provide the password or any other means that may be used to unlock or access another person's device(s), including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

**ATTACHMENT A-12**
**Person and Premises to be Searched**

<u>Premises to be Searched:</u> Subject Premises 12 is located at 8 Red Mesa Housing, Crownpoint, NM

87313, and may be described as a single story residence, with brown stucco siding, white trim and a

gray shingle roof. A color photograph of the Subject Premises is contained below.



Surveillance photo

The search of Subject Premises A-12 shall include the entire residence and all outbuildings, trash cans,

and storage containers designated for use by the occupants of the Subject Premises. The search shall also

include vehicles parked at, or in front of, the Subject Premises provided such vehicle has an apparent

connection to the Subject Premises. Connection to the Subject Premises may be established by way of

prior law enforcement observation, vehicle registration, subject admission or possession of an ignition

key.

<u>Biometric Access to Devices:</u> During the execution of the search of the premises described herein, law

enforcement officers are also specifically authorized to compel any individual, who is found at the Subject

Premises and reasonably believed by law enforcement to be a user of the device, to provide biometric

features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or

any other security feature requiring biometric recognition, of:

Page 1

**ATTACHMENT A-12**
**Person and Premises to be Searched**

1. Any devices found at the premises, and

2. Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant.

3. This warrant authorizes law enforcement personnel to compel any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device. Further, this warrant does not authorize law enforcement personnel to request that the individual state or otherwise provide the password or any other means that may be used to unlock or access another person's device(s), including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

Page 2

**ATTACHMENT A-13**
**Person and Premises to be Searched**

<u>Premises to be Searched:</u> Subject Premises 13 is located at 7 Hughes Blvd, Grants, NM 87020[1] and may be described as a cabin style residence which is tan, brown, and gray in color with white and wood trim. Color photographs of the Subject Premises are contained below.





Surveillance photographs



Google Streetview photo

---

[1] There is a large wooden shed which crosses over the property line, from 7 Hughes Blvd, Grants, NM 87020, to the adjoining property, identified as 2201 West Highway 66, Grants, NM 87020. This warrant authorizes agents to search both of the above listed properties, as they share a building.

Page 1

**ATTACHMENT A-13**
**Person and Premises to be Searched**

The search of Subject Premises A-13 shall include the entire residence and all outbuildings, trash cans, and storage containers designated for use by the occupants of the Subject Premises. The search shall also include vehicles parked at, or in front of, the Subject Premises provided such vehicle has an apparent connection to the Subject Premises. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission or possession of an ignition key.

<u>Biometric Access to Devices:</u> During the execution of the search of the premises described herein, law enforcement officers are also specifically authorized to compel any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of:

1. Any devices found at the premises, and

2. Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant.

3. This warrant authorizes law enforcement personnel to compel any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device. Further, this warrant does not authorize law enforcement personnel to request that the individual state or otherwise provide the password or any other means that may be used to unlock or access another person's device(s), including by identifying the specific

**ATTACHMENT A-13**
**Person and Premises to be Searched**

biometric characteristics (including the unique finger(s) or other physical features) that may

be used to unlock or access the devices.

**ATTACHMENT B**
**Items to be Seized**

**Items to be Seized: A**ll evidence, fruits, and instrumentalities of violations of: 21 U.S.C. §§ 841(a) Possession with Intent to Distribute Controlled Substances, 843(b) Use of a Communication Facility in Furtherance of Drug Trafficking, 846 Conspiracy to Distribute Controlled Substances, 18 U.S.C. §§ 1956(a)(1) Money Laundering, 1791 Providing or Possessing Contraband in a Jail Facility, 666 Theft or Bribery Concerning Programs Receiving Federal Funds, 371 Conspiracy, and 2 Aiding and Abetting. to include the following:

1. Controlled substances, drug packaging materials, and paraphernalia;

2. Large amounts of United States Currency and expensive jewelry;

3. Articles of property tending to establish the identity of persons in control of premises, vehicles, storage areas, and containers being searched, including utility company receipts, rent receipts, addressed envelopes, and keys;

4. Documentary evidence demonstrating any communication or correspondence with any person or groups of persons involved in transporting, ordering, purchasing, or distributing drugs; smuggling drugs into CCCC; and money laundering;

5. All evidence related to off-site storage units, other residences, safety deposit boxes, etc. where evidence of the Target Offenses may be stored for safekeeping against seizure;

6. Cellular telephones; and

7. All safes or lock boxes, where evidence of the Target Offenses may be stored for safekeeping against seizure.